# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO, FLORIDA

UNITED STATES OF AMERICA
and STATE OF FLORIDA *ex rel.*
OMNI HEALTHCARE, INC.,

      Plaintiffs

v.                                     CASE NO: 6:19-cv-02237-RBD

HEALTH FIRST, INC.; HEALTH FIRST
MEDICAL GROUP, LLC; STEVEN JOHNSON;
JOSEPH FELKNER; DREW RECTOR;
LEONARD GRECUL; MARK MENDOLLA;
THOMAS SWAIN; STEVEN KARAS;
ENRIQUE POLANCO; JOSEPH McCLURE;
LEE SCHEINBART; SIMON VINARSKY;
MATTHEW GERRELL; AMIT BAROCHIA;
RICHARD SPRAWLS; ASISH DALAL;
JOHN BOMALASKI; GERMAINE BLAINE;
FIRAS MUWALLA; RITESH PATIL;
GRAINGER STEELE LANNEAU;
JAMES NEEL; and JEFFREY STALNAKER,

      Defendants.

_____/


## DEFENDANTS HEALTH FIRST, INC. AND HEALTH FIRST MEDICAL GROUP, LLC'S MOTION TO DISMISS OMNI HEALTHCARE, INC.'S AMENDED COMPLAINT WITH PREJUDICE AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

BACKGROUND ........................................................................................................................ 2

    A. Omni and Dr. Deligdish's Current Case .................................................................. 2

    B. Omni's and Dr. Deligdish's Prior Cases .................................................................. 3

LEGAL ARGUMENT ............................................................................................................... 5

I.    THE AC FAILS TO SATISFY RULE 8'S PLAUSIBILITY AND RULE 9(B)'S
    PARTICULARITY PLEADING STANDARDS ................................................................ 5

    A. The AC Does Not Plead An Underlying Fraudulent Scheme With
        Particularity. ............................................................................................................ 7

        1.    Alleged Physician Compensation Arrangements ........................................... 8

        2.    Alleged MIMA Physician Referrals to Health First ..................................... 15

        3.    Alleged "Specialty Referrals" ...................................................................... 17

        4.    General Allegations Regarding Physician Contracts ..................................... 18

    B. The AC Does Not Plead A Single Actual "False" Claim With Particularity,
        Nor Does It Provide Sufficient Indicia of Reliability that an Actual "False"
        Claim Was Submitted to the Government. ............................................................ 18

    C. The AC Does Not Plausibly State an AKS or Stark Violation. ........................ 22

        1.    AKS ........................................................................................................... 23

        2.    Stark .......................................................................................................... 24

II.   OMNI LACKS STANDING TO PURSUE THIS ACTION ............................................... 25

III.  THE AC SHOULD BE DISMISSED UNDER THE PUBLIC DISCLOSURE BAR. ........ 29

    A. The AC's Allegations Have Been Publicly Disclosed. ....................................... 31

    B. The AC Is Based on Publicly Disclosed Information. ......................................... 32

    C. Omni Is Not an Original Source. ......................................................................... 32

CONCLUSION ......................................................................................................................... 34

RULE 3.01(G) CERTIFICATION ............................................................................................ 36

7524485.1

## **TABLE OF AUTHORITIES**

**CASES**

*American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) ................................. 6, 23

*Ashcroft v. Iqbal*, 556 U.S. 662  (2009) ................................................................................. 6, 25

*Baker v. Felts*, Case No. 8:06-cv-1108-T-17MAP, 2006 WL 2787804
    (M.D. Fla. Sept. 26, 2006) ................................................................................................. 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 5

*Bingham v. HCA, Inc.*, 783 Fed. Appx 868 (11th Cir. 2019) ...................................................... 8

*Carrel v. AIDS Healthcare Foundation, Inc.*, 898 F.3d 1267 (11th Cir. 2018)........................... 23

*Cooper v. Blue Cross Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994) ................ 31, 32

*Corsello v. Lincare*, 428 F.3d 1008 (11th Cir. 2005) .......................................................... 18, 19

*Hericks v. Lincare, Inc.*, Civil Action No. 07-387, 2014 WL 1225660
    (E.D. Pa. Mar. 25, 2014)................................................................................................... 23

*McElmurray v. Consolidated Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244
    (11th Cir. 2007)................................................................................................................. 31

*Mercer v. North Broward Hosp. District*, 270 Fed. Appx. 789 (11th Cir. 2008) ........................ 34

*Omni Healthcare, Inc. et al. v. Health First, Inc., et at.*, Case No. 6:13-cv-1509-RBD
    (M.D. Fla.) ............................................................................................................... passim

*United States ex rel Fla. Soc'y of Anesthesiologists v. Choudhry,* 262 F. Supp. 3d 1299
    (M.D. Fla. 2017) .............................................................................................................. 22

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006)........................... 6, 8, 19

*United States ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp.3d 1288 (M.D. Fla. 2018).............. 33

*United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493 (6th Cir. 2007) ........................ 7

*United States ex rel. Chase v. HPC Healthcare*, 723 Fed. Appx. 783 (11th Cir 2018)............... 22

*United States ex rel. Childress v. Ocala Heart Institute, Inc.*, Case
    No: 5:13-cv-470-Oc-22PRL, 2015 WL 13793109 (M.D. Fla. July 2, 2015) ................ 7, 15, 16

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301(11th Cir. 2002) ....... 6, 19

7524485.1

*United States ex rel. D'Anna v. Lee Mem. Health Sys.*, Case No: 2:14-cv-437-FtM-38CM,
2019 WL 1061113 (M.D. Fla. Mar. 6, 2019) .................................................................. 21, 24

*United States ex rel. Dennis v. Health Management Assoc., Inc.*, No. 3:09-cv-00484,
2013 WL 146048 (M.D. Tenn. Jan. 14, 2013)..................................................................... 8

*United States ex rel. Fernandez v. Miami Cancer Inst.*, Civil Action No. 17-24051-Civ-Scola,
2019 WL 1993513 (S.D. Fla. May 6, 2019) ....................................................................... 21

*United States ex rel. Gilbert v. Virginia College, LLC*, 305 F. Supp.3d 1315
(N.D. Ala. 2018) ................................................................................................................ 31

*United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir 1994) .............................. 28

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Svs.*,
Case No. CV 17-1694 PSG (SSx), 2019 WL 3282619 (C.D. Cal. July 16, 2019).................. 32

*United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare, Inc.*,
Civil Action No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) ........ 32

*United States ex rel. John Doe v. Health First, Inc.*, Case No. 6:14-cv-501-DAB
(M.D. Fla.) ................................................................................................................... passim

*United States ex rel. Keeler v. Eisai*, 568 Fed. Appx. 783 (11th Cir. 2014)........................... 7, 23

*United States ex rel. Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*,
Case No. 07-80323-CIV-Middlebrooks/Johnson, 2009 WL 10667702
(S.D. Fla. Mar. 24, 2009) .................................................................................................. 25

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693
(11th Cir. 2014)............................................................................................................. passim

*United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805 (11th Cir. 2015) .......... 4, 30, 31, 32

*United States ex rel. Saldivar v. Fresenius Medical Care Holdings*, 841 F.3d 927
(11th Cir. 2016)................................................................................................................. 34

*United States ex rel. Whitten v. Triad Hosp., Inc.*, Case No Civ. A-CV-202-189,
2005 WL 3741538 (S.D. Ga. Oct. 27, 2005) ............................................................. 27, 28, 29

*United States v. Hastie*, 854 F.3d 1298 (11th Cir. 2017)............................................................ 26

*United States v. Select Med. Corp.*, No. 3:12-cv-00051(RLY-DML), 2017 WL 468276
(S.D. Ind. Feb. 3, 2017) .................................................................................................... 30

*Universal Health Services, Inc. v. Escobar*, 136 S. Ct. 1989 (2016)............................................. 5

*Vanderberg v. Donaldson*, 259 F.3d 1321 (11th Cir. 2001) ...................................................... 34

7524485.1

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) .............. 3, 17

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) ...................................................... 6

**STATUTES**

31 U.S.C. § 3729(1)(A) ..................................................................................................... 22

31 U.S.C. § 3729(a)(1)(A)-(C) ............................................................................................. 2

31 U.S.C. § 3729(a)(1)(B) ................................................................................................. 22

31 U.S.C. § 3729(a)(1)(C) ................................................................................................. 22

31 U.S.C. § 3730(b)(2) ....................................................................................................... 34

31 U.S.C. § 3730(d)(4) ....................................................................................................... 35

31 U.S.C. § 3730(e)(4) ................................................................................................. 2, 30

31 U.S.C. § 3730(e)(4)(A) ..................................................................................... 29, 31, 33

31 U.S.C. § 3730(e)(4)(A)(ii) ....................................................................................... 31, 32

31 U.S.C. § 3730(e)(4)(B) ................................................................................................. 33

31 U.S.S § 3730(e)(4)(a)(i) ................................................................................................. 31

42 U.S.C. § 1320a-7b .......................................................................................................... 1

42 U.S.C. § 1320a-7b(b)(2)-(b)(3)(B) ................................................................................ 23

42 U.S.C. § 1395nn ............................................................................................................. 1

42 U.S.C. § 1395nn(a)(1)(A)-(B) ....................................................................................... 24

42 U.S.C. § 1395nn(a)(2)(B) .............................................................................................. 24

42 U.S.C. § 1395nn(e)(2) ................................................................................................... 24

42 U.S.C. § 1395nn(h)(6) ................................................................................................... 25

Fla. Stat. § 68.082(a)-(c) ..................................................................................................... 3

**RULES**

Federal Rule of Civil Procedure 8 .............................................................................. passim

Federal Rule of Civil Procedure 8(a) ................................................................................... 1

Federal Rule of Civil Procedure 9 ................................................................................ 11

Federal Rule of Civil Procedure 9(b) .................................................................... passim

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 1

Federal Rule of Civil Procedure 12(b)(1) ...................................................................... 1

## REGULATIONS

42 C.F.R. § 411.351 ...................................................................................................... 25

42 C.F.R. § 411.357(c) ................................................................................................. 24

42 C.F.R. § 411.357(c)(4) ............................................................................................. 24

42 C.F.R. § 1001.952(i) ................................................................................................ 23

## OTHER AUTHORITIES

Pub. L. No. 111-148, § 10104(j)(2), 124 Stat 119, 829 (2010) ................................... 29

7524485.1

Defendants Health First, Inc. and Health First Medical Group, LLC ("HFMG") (collectively, "Health First") move pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1), and 12(b)(6) to dismiss with prejudice the latest of many cases brought by Relator Omni Healthcare, Inc. ("Omni") and its "principal," Dr. Craig Deligdish.  The Amended Complaint ("AC") fails for four independent reasons.

First, the AC must be dismissed for failure to satisfy Rule 9(b)'s heightened pleading standards.  Omni's conclusory allegations provide no details, such as the who, what, when, where, and how of any of the myriad alleged underlying fraudulent schemes—and no particulars of a single actual false claim, the *sine qua non* of a False Claims Act ("FCA") violation.  Nor do Omni's allegations otherwise possess any indicia of reliability to satisfy the Eleventh Circuit's stringent Rule 9(b) standards in FCA actions.

Second, the AC must be dismissed because Omni fails to plead a plausible claim for relief under Rule 8's minimal pleading standards.  The AC's allegations are premised on claimed underlying violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and the Stark Physician Self-Referral Law ("Stark"), 42 U.S.C. § 1395nn.  But the alleged AKS violations are implausible because the AKS expressly exempts remuneration to employees from its prohibitions, and the AC fails to explain how the remuneration runs afoul of the AKS.  Similarly, the alleged Stark violations are implausible because no factual allegations support an actual violation of the statute.

Third, all claims that predate June 9, 2017, must be dismissed because both Omni and its principal, Dr. Deligdish, have already *twice* released Health First and the other defendants of any and all liability for such claims.  As such, Omni lacks standing to pursue its claims.

Fourth, some of the allegations have been publicly disclosed, and Omni does not qualify as an "original source" under 31 U.S.C. § 3730(e)(4), compelling dismissal on that ground as well.

In short, the AC must be dismissed, not only because it is plainly deficient under the Federal Rules, but also because it seeks to double-dip by bringing a suit for already-settled claims, and because its parasitic claims have already been publicly disclosed.

## BACKGROUND[1]

### A.  **Omni and Dr. Deligdish's Current Case**

Omni is a multi-specialty physician group based in Brevard County, Florida.  Dkt. 11 at ¶ 7.  Although Omni is the nominal relator, the AC's allegations purportedly are "based on the personal observation of Relator Omni's principal [Dr. Deligdish], as well as documents and information in *his* possession." *Id.* at ¶ 7 (emphasis added).  However, Dr. Deligdish never worked at Health First, nor does he identify the provenance of documents and information "in his possession."  *Id.* at ¶ 7.  Health First is an integrated health system that owns four hospitals, and also owns the largest multi-specialty physician group in Brevard County, having acquired Melbourne Internal Associates ("MIMA") in February 2013, which then became HFMG.  *Id.* at ¶ ¶ 8-9, 50.

After the United States investigated and declined to intervene in this case,[2] Omni filed the AC, adding as defendants 24 executives, cardiologists, and oncologists employed by Health First. Dkts. 7 & 11.  The AC avers that Health First and its executive and physician employees violated three different provisions of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A)-(C) (all subsumed into Count I), and three different provisions of Florida's FCA ("FFCA"), Fla. Stat.

---

[1]      For purposes of this motion to dismiss only, Health First recites the allegations as if true.

[2]      The State of Florida also declined to intervene.  Dkt. 8.

7524485.1

§ 68.082(a)-(c) (all subsumed into Count II), by allegedly presenting false claims for payment to government healthcare programs, making false records material to those payment claims, and conspiring to violate the FCA and the FFCA.[3]

The alleged FCA and FFCA violations are premised on claimed violations of the AKS and Stark.  The AC generally alleges that Health First engaged in several "schemes" to ensure that physicians refer government-insured patients to Health First facilities, including by purportedly providing former MIMA doctors with paid medical directorships for little to no work; manipulating physicians' pay formulas to reward doctors with a high number of referrals to Health First;  paying physicians too much to supervise mid-level providers;  arbitrarily increasing compensation to high volume physician referrers when they complained their pay was too low; and rewarding physicians for the volume and value of designated health services, including chemotherapy drugs.  Dkt. 11 at ¶¶ 2,  47.  These allegations are summarized further *infra*.

### B.  Omni's and Dr. Deligdish's Prior Cases

The current case against Health First is the third one brought against it by Omni and Dr. Deligdish.  More than three years ago, this Court dismissed, *with prejudice*, Relator John Doe's FCA suit against Health First, observing that "[a]fter more than three years of litigation, it is finally finished—the parties to this False Claims Act proceeding have settled."  *See* June 14, 2017, Order,

---

[3]       In shotgun style, the AC "commits the sin of not separating into a different count each cause of action or claim for relief" by grouping three different alleged violations of the FCA in Count I, and three different alleged violations of the FFCA in Count II, apparently against all twenty-six defendants without specifying what each defendant allegedly did.  *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (discussing different varieties of shotgun pleadings that are subject to dismissal for violation Fed. R. Civ. P. 8); July 27, 2016, Order at 9, Dkt. 119, *United States ex rel. John Doe v. Health First, Inc.*, Case No. 6:14-cv-501-DAB (M.D. Fla.) ("Doe FCA Suit") ("Given the necessity of pleading FCA claims with particularity, the large number of Defendants named in the Amended Complaint, and the expanse of time at issue, Relator [Deligdish's] shotgun-style pleading is particularly problematic and must be remedied").

Dkt. 145, *United States ex rel. John Doe v. Health First, Inc.*, Case No. 6:14-cv-501-DAB (M.D. Fla.) ("Doe FCA Suit").[4]  The relator in the Doe FCA Suit—Dr. Deligdish—is Omni's principal in this case.  *See* Doe FCA Suit, Settlement Agreement, Dkt. 143 at 8-16 (settlement agreement identifying Dr. Deligdish as relator); Dkt. 11 at ¶ 99 ("The principal at Relator Omni, Dr. Craig Deligdish, has been the victim of similar corrupt practices.").  As in the current case, Dr. Deligdish alleged in the Doe FCA Suit that Health First violated the AKS and Stark, resulting in the submission of "false" claims for payment to government healthcare programs, including by purportedly "paying MIMA physicians exorbitant fees as Medical Directors . . . for little or no work performed."  *See* Doe FCA Suit, Am. Compl., Dkt. 61 at ¶¶ 1, 3, 88-98.

In addition to the Doe FCA Suit, Omni and Dr. Deligdish sued Health First in a separate antitrust action, *Omni Healthcare, Inc. et al. v. Health First, Inc., et at.*, Case No. 6:13-cv-1509-RBD (M.D. Fla.) ("Antitrust Suit").  In the Antitrust Suit, Omni and Dr. Deligdish, among other plaintiffs, alleged that Health First engaged in anti-competitive conduct to gain patient referrals: "[t]he most efficient way to control a doctor's referral is to employ the doctor directly; the next best way is to use a stick," and complained that Health First's acquisition of MIMA "permits Health First to control the referrals of MIMA's physicians . . . ."  *See* Antitrust Suit, Third Am. Compl., Dkt 57 at ¶¶ 2, 4.

---

[4]     The Court may take judicial notice of filings in court cases without converting this motion into one for summary judgment for the limited purpose of establishing the existence of and subject matter of prior litigation.  *See, e.g., United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n. 4 (11th Cir. 2015) ("Courts may take judicial notice of publicly filed documents."); *Baker v. Felts*, Case No. 8:06-cv-1108-T-17MAP, 2006 WL 2787804 at * 2 (M.D. Fla. Sept. 26, 2006) ("[T]he Court may take judicial notice of documents filed in other judicial proceedings, without converting a motion to dismiss to a motion for summary judgment, for the limited purpose of recognizing the subject matter of the litigation and/or issues decided.").

7524485.1

To resolve these matters without the admission of liability and avoid further litigation expenses, the Doe FCA Suit and Antitrust Suit parties entered into settlement agreements in which Omni and Dr. Deligdish broadly released all claims they had or could have brought on or before June 9, 2017, against Health First, its affiliates and subsidiaries, and its current, former and future employees and officers.  *See* Exh. A at p 1-2, Antitrust Suit General Release, Hold Harmless Agreement and No Lien Affidavit, Dkt., 361-1; Exh. B at ¶¶ 8, 19, Doe FCA Suit Settlement Agreement, Dkt. 143.  Notwithstanding those releases, Omni has again sued Health First, and its various executives and physician employees based on allegations that date *as far back as 2011*.[5]

## LEGAL ARGUMENT

### I.    THE AC FAILS TO SATISFY RULE 8'S PLAUSIBILITY AND RULE 9(b)'S PARTICULARITY PLEADING STANDARDS.

FCA relators "must . . . . plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."  *Universal Health Services, Inc. v. Escobar*, 136 S. Ct. 1989, 2004 n. 6 (2016).  To satisfy Rule 8, a complaint's allegations must "possess enough heft to 'sho[w] that the [Relator] is entitled to relief," requiring "more than labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The Court must disregard any "bald assertions" and "legal conclusion[s] couched as factual allegation[s]"—for Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"—and then engage in "a context-specific task that

---

[5]    On February 29, 2016, counsel for Dr. Deligdish in the Doe FCA Suit advised the Court that Dr. Deligdish had received millions of pages of documents from Health First in discovery. *See* Doe FCA Suit, Dkt. 93 at ¶ 4 ("To date, Defendant Health First has made available to Relator the entirety of its document production in the OMNI anti-trust litigation consisting of approximately 5,100,361 pages of documents.").

7524485.1

requires the reviewing court to draw on its judicial experience and common sense" to determine if "a complaint states a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. If a complaint's non-conclusory factual allegations stop "short of the line between possibility and plausibility of 'entitlement to relief'," the complaint fails to state a claim. *Id.* at 678. That standard is not satisfied where "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal citation omitted).

In addition to Rule 8, FCA actions must also comply with Rule 9(b)'s heightened particularity requirements. *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1308-09 (11th Cir. 2002). The purpose of Rule 9(b) is to "alert[] defendants to the 'precise misconduct with which they are charged' and protect[] 'defendants against spurious charges'." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotation marks omitted). It further serves as an important procedural check on relators' strong financial incentives to bring frivolous *qui tam* actions. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006) ("Rule 9(b) ensures that the relator's strong financial incentive to bring an FCA claim . . . does not precipitate the filing of frivolous suits.").

Absent strict compliance with Rule 9(b), a relator could "learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and at worst, are [*sic*] baseless allegations used to extract settlements." *McInteer*, 470 F.3d at 1359 (citing *Clausen*, 290

F.3d at 1314 n.24); *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007) (observing Rule 9(b) protects defendants against "fishing expeditions and strike suits.").

Applying these standards, the AC fails to plausibly allege an underlying AKS or Stark violation, and it certainly does not provide sufficient particulars in support.  Instead, the AC's allegations are factually unsupported and non-particularized.  For example, the AC fails to identify any patient covered by a government healthcare program referred by any physician with a "suspect" compensation arrangement to Health First, fails to provide any factual basis for the Court to conclude that any particular physician's compensation arrangement was based on the value or volume of any referrals, and, critically for an FCA complaint, fails to provide the requisite indicia of reliability that Health First submitted any actual "false" claim for payment to a government healthcare program.  For all these reasons, dismissal is required.

### A. The AC Does Not Plead An Underlying Fraudulent Scheme With Particularity.

To avoid dismissal, the AC must satisfy Rule 9(b) as to the underlying AKS and Stark "schemes." *United States ex rel. Childress v. Ocala Heart Institute, Inc.*, Case No: 5:13-cv-470-Oc-22PRL, 2015 WL 13793109, at *4 (M.D. Fla. July 2, 2015) ("Violations of the AKS and Stark statute must be pled with particularly under Rule 9(b) because they are brought as FCA claims."); *see also United States ex rel. Keeler v. Eisai*, 568 Fed. Appx. 783, 793 (11th Cir. 2014) ("'Underlying schemes and other wrongful activities that result in the [alleged] submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)'.") (internal citation omitted).

As to an underlying scheme, "[p]articularity means that 'a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant[s]' allegedly fraudulent acts, when they occurred, and who engaged in them'."

*McInteer*, 470 F.3d at 1357.  The AC is wholly lacking in such particulars: it repeatedly refers to unidentified physicians, fails to identify relevant time periods, and provides no details undergirding its conclusory accusations.

### 1.    Alleged Physician Compensation Arrangements

The AC alleges that Health First overpaid its physicians, but provides no details as to how any particular physician was in fact compensated, nor does it provide anything more than conclusory assertions that any physician's compensation was not within fair market value for services rendered.  In fact, it fails to even identify any such services.  In concluding that compensation is not within fair market value, Omni references alleged percentiles of physicians' compensation but provides no basis to conclude why such compensation is not fair market value. It does not, for example, provide any comparison to similarly situated physicians performing similar services.  *See Bingham v. HCA, Inc.*, 783 Fed. Appx 868, 873 (11th Cir. 2019) ("Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value.") (internal citation omitted).[6]  Such conclusory allegations do not satisfy Rules 8 or 9(b).

### (a)    Medical Directorships

The AC alleges that as "part of the deal" in which Health First acquired MIMA, Health First assured the MIMA physicians that "their compensation would be kept 'whole' in exchange for the doctors giving up their outside medical directorships" by, in turn, providing one-third—42

---

[6]     *See also United States ex rel. Dennis v. Health Management Assoc., Inc.*, No. 3:09-cv-00484, 2013 WL 146048, at *13 (M.D. Tenn. Jan. 14, 2013) (Rule 9(b) not satisfied where relator claimed physician and hospital violated the AKS because the hospital paid the physician $60,000 per year to serve as a "Group Director" and further claimed that the compensation was "in excess of fair market value," but where relator "offer[ed] no detail to establish AKS . . . violations," and said "nothing about what [the physician's] duties were or why $60,000 per year would exceed fair market value compensation for those duties.").

7524485.1

of 118—of MIMA's doctors with medical directorships at unidentified Health First facilities for which they would receive additional compensation. Dkt. 11 at ¶¶ 56, 57.

The AC does not identify a single physician who received a medical directorship; the facilities where the unidentified physicians served as medical directors; the periods of time at issue; or the terms of the medical directorships, such as the compensation and scope of services. The AC also fails to identify a single instance where an unidentified physician failed to perform any of the unidentified services required under a medical directorship, and for which a physician was allegedly paid an unknown amount. In short, the AC not only fails to allege a particular improper directorship, but also fails to offer any detail as to why such a directorship would be improper.

Even when the AC attempts to adorn its bare-bones allegations with "facts," that effort falls short: "one MIMA doctor refused to sign a contract for a $40,000 medical directorship because, in his opinion, it required him to perform little or no actual service." Dkt. 11 at ¶ 59. The alleged MIMA doctor is not identified. The date of the alleged medical directorship is not identified. A copy of the alleged medical directorship contract is not attached. The terms of the directorship are not provided.

Similarly, in a failed effort to provide the illusion of detail where none exists, the AC quotes from a Jutta Williams April 27, 2015 email in which she allegedly told Defendant Stephen Johnson that "some of the MIMA physician contracts had some 'quite serious' potential Stark issues," together with "evidence" that some of the physicians were "not completing time sheets, and/or were performing little or no actual services." *Id.* at ¶ 58. No particulars about the alleged Stark concerns are provided, no physicians are identified, no details of time actually required or worked have been provided, and no "evidence" in support are identified.

9

The AC is just as deficient as the medical director allegations Dr. Deligdish previously made in the Doe FCA Suit, which this Court deemed insufficient to satisfy Rule 8's plausibility and Rule 9(b)'s particularity standards.  *See* Doe FCA Suit, Dkt. 61 at ¶ ¶ 87-98 (complaining about allegedly improper medical directorships through "mid-2015") and Dkt. 119 (dismissing the Doe FCA Suit amended complaint without prejudice).

(b)      Alleged Manipulation of Physicians' Pay Formulas

The AC similarly alleges in conclusory fashion that Health First "manipulates" key elements of physicians' pay formulas—specifically, the number of work relative value units ("wRVUs") and base pay—to reward doctors with a high number of referrals.  Dkt. 11 at ¶ 47. Devoid of particulars, the AC merely alleges that a doctor named Tim Carter "questioned" whether Health First should base his pay and that of his unidentified colleagues on work they never performed, and instead asked that "accurate and appropriate measures be used to correctly calculate compensation and inappropriate codes be eliminated."  *Id.* at ¶ 60.  It does not allege when Dr. Carter raised that "question," what the "inappropriate codes" were, whether those unidentified codes were (or were not) ultimately eliminated, and whether Dr. Carter later became satisfied with (or continued to question) the manner in which his compensation was ultimately calculated.  There is not even a single allegation identifying the amount of Dr. Carter's compensation, or any allegedly "tainted" referrals by him to Health First.

The AC also alleges that how and how much Health First paid MIMA doctors was a "'significant'" part of the negotiations between Health First and MIMA.  Dkt. 11 at ¶ 61.  While acknowledging that use of the wRVU is meant to assist with regulatory compliance, the AC alleges in summary fashion that Health First "inflated key elements of the [wRVU] calculations" to "convince the MIMA doctors to sign on and send referrals to" the Health First system.  *Id.* at ¶ 64.

Nowhere does it identify who at Health First allegedly determined the number of work units for each doctor, or even which MIMA doctors are at issue.

Nor does Omni provide any of the requisite particulars around any of the allegedly inflated elements.  The AC alleges, for example, that unidentified MIMA doctors' 2011 W-2 earnings "included pay that should not have been included," Dkt. 11 at ¶ 65, but provides no explanation why certain of the unidentified physicians' pay should not have been included, or what that pay was.

The AC also contends—again in conclusory fashion—that Health First manipulated a "second key element" for the "wRVU component awarded for each procedure," which "positively impacted compensation for all physicians performing multiple procedures" and incentivized unidentified physicians to perform "multiple procedures. "  Dkt. 11 at ¶ 67.  No particulars are provided, other than a summary assertion that Health First "failed to apply the multiple-procedure discounts" which then "artificially inflat[ed] the wRVUs and physician earnings."  *Id.*

Piling conclusion upon conclusion, the AC alleges that this resulted in three of five former MIMA urologists placing in the "top tier nationally."  Dkt. 11 at ¶ 67.  The AC does not identify the urologists, explain the meaning of "top tier," identify the relevant benchmark against which that tier is measured, or identify the years in question.  Such bald and conclusory allegations do not come within striking distance of Rule 8's minimal, let alone Rule 9's heightened, pleading standards.

Similarly, the AC alleges that MIMA doctors had the option to accept a "supervising fee," consisting of 15 percent of collections for mid-level providers, or paying the mid-level providers themselves, and keeping the profit. Dkt. 11 at ¶ 68.  The AC, however, provides no basis to support its conclusion that paying a doctor a fee to supervise subordinate mid-level providers, or granting

11

a doctor the option to engage and pay his or her own subordinate mid-level providers and keep the profit, is improper.  Nor does the AC provide any particulars, *i.e.*, which MIMA doctors were paid a 15 percent collections fee to supervise which mid-level providers, or which MIMA doctors elected to allegedly hire and pay for their own mid-level providers and keep the profit.

Last, the AC contends that Health First's on-call compensation arrangements are in "direct violation of OIG rules."  Dkt. 11 at ¶ 71.  All the AC says is this: "[s]ince at least 2013, Health First has treated employed and private physicians differently," with employed physicians receiving wRVUs when they provide on-call services to "care for an indigent patient," whereas private physicians are "not compensated."  *Id.*  The AC does not identify "the OIG rules" to which it refers, and provides none of the requisite particulars, *i.e.*, the names of the employed physicians who received wRVUs in connection with any particular instance of on-call indigent patient care and the names of private physicians who did not receive similar compensation for similar services, and how, if at all, that resulted in a false claim for payment that gives rise to an FCA action.

(c)      Payment for Mid-Level Providers

Health First allegedly relies on mid-level providers to increase referrals and profit, a practice that MIMA supposedly "pioneered" and which Health First continued.  Dkt. 11 at ¶¶ 72-73.  In support, the AC refers to a February 2013 PowerPoint by Debra Johnsen, the Chief Operating Administrator "of the medical group," and Richard Baney, "the group's Medical Director," that allegedly reflected increased physician pay.  *Id.* at ¶¶ 74-75.

An unidentified physician purportedly said in an "interview" of unknown date by an unknown interviewer that at some unidentified time he received between $75,000 and $100,000 for each mid-level provider "each year," which represented an alleged "apparent profit" of 50 percent from managing two unidentified nurse practitioners.  *Id.* at ¶ 76.  A physician—it is not clear whether it is the same physician from "the interview" or another unidentified physician—

12

claims that in 2016 Health First "acknowledged" that its payment formulas violated unspecified "CMS rules," and capped the amount of physician supervision fees at $75,000. *Id.* at ¶ 77. In January 2019, Health First allegedly capped payments to unidentified physicians supervising unidentified mid-level providers at $25,000, purportedly to comply with unspecified "CMS rules."[7] *Id.* This resulted in a pay cut that caused some "other physicians" to leave. *Id.* That is the sum total of the allegations. No physicians are identified, no mid-level providers or their referrals are identified, no explanation for how paying a physician to supervise mid-level providers is illegal, and the "CMS rules" to which the AC refers are not identified.

(d)     Changing Physician Compensation Calculations

The AC alleges that "[w]hen physicians complained that their compensation packages did not pay enough, Health First simply manipulated its calculations to increase their paychecks." Dkt. 11 at ¶ 78. Again, no physicians are identified. Instead, the AC refers to an "example" of an unidentified physician, who in 2012, allegedly disagreed with his or her compensation and negotiated an $80,000 adjustment with Health First. *Id.* at ¶¶ 78-79. No details are provided, such as the factors considered in making the alleged compensation adjustment. According to the AC, the "individualized contract negotiations" pushed "30 percent of the 73 MIMA doctors"[8] into the "highest compensation levels in the country—the 80th percentile or better." *Id.* at ¶ 80. No doctors are identified, nor is their pay or any relevant benchmark from which to assess that any of their compensation is in the "80th percentile or better, and no allegation supports the conclusion that their compensation was tied to the volume or value of any patient referrals.

---

[7]     This is the first allegation in the AC that references anything after 2017, the year of the Doe FCA Suit release.

[8]     In paragraph 57, the AC claims there are 118, not 73, "MIMA" doctors.

13

       (e)       Compensation of Oncologists Allegedly Tied to Value and Volume
of Drugs Prescribed

In September 2015, HFMG acquired the Space Coast Cancer Center ("SCCC"), an oncology group employing medical and radiation oncologists.  Dkt. 11 at ¶ 120.  After the acquisition, Health First allegedly "altered its employment structure to provide bonuses based on the medications administered by doctors in violation of both the AKS and Stark."  *Id.*  These changes in 2015 supposedly "exacerbated a differential compensation system instituted" when Health First acquired MIMA (now HFMG) two years earlier, arrangements that the AC broadly claims "also violated laws designed to prevent kickbacks."  *Id.* at ¶ 121.

One alleged arrangement implemented "during the MIMA acquisition" in 2013 rewarded doctors based on the volume and profitability of parenteral medications such that "the larger the volume of these profitable parenteral medications, the bigger the bonus."  Dkt. 11 at ¶ 122.  The compensation of a former MIMA physician, Dr. Havkin, whom the AC claims to have been "the largest utilizer of testosterone pellets in the United States," allegedly grew with each pellet inserted by "artificially increasing the conversion factor used to calculate" his compensation, such that his pay package "soared into the 90th percentile for urologists nationally."  *Id.* at ¶ 123.  Beyond a general description of the alleged wRVU "manipulation" scheme, the AC provides no details—no copy of Dr. Havkin's employment contract setting forth the manner in which his compensation was calculated, no specific instance in which his alleged use of a testosterone pellet allegedly affected his compensation, and no identification of any patient on whom Dr. Havkin allegedly used a testosterone pellet and for which Health First made claim for payment to a government healthcare program.  The AC does not even identify when Dr. Havkin worked for Health First.

A second alleged 2013 MIMA acquisition "arrangement" increased compensation to unidentified former MIMA dermatologists by directing profits for certain "flow through" items like skin care products to "specialists." Dkt. 11 at ¶ 124.  The AC provides no details.

A third alleged 2013 MIMA acquisition "arrangement" purportedly allocated different conversion factors to unidentified former MIMA oncologists "based on profitability as measured by reports" called "Contribution Margin," which compared revenue and costs to calculate the contribution margin of each physician. Dkt. 11 at ¶ 125.  No particulars are provided.

After SCCC's acquisition, Health First allegedly recalculated "the conversion factors" used to calculate pay to increase compensation to the oncologists. Dkt. 11 at ¶ 126.  The AC provides a hypothetical "example" case "with $21,072 and costs of $14,063" which would "generate a contribution margin of $7,008 for that doctor." *Id.*  But no doctor is identified, and the example is provided in a complete vacuum, rendering whatever meaning it may have to Omni, meaningless to anyone else.  The AC goes on to blanketly accuse 15 different SCCC oncologists—most of whom, but not all, have been named as defendants—of having their compensation allegedly tied to the value and amount of chemotherapy drugs administered to their patients. *Id.* at ¶ 128.  The AC does not provide a single factual allegation or detail to support that conclusory accusation.

### 2. Alleged MIMA Physician Referrals to Health First

Although the AC is predicated on allegedly improper referrals from those physicians to Health First and for which Health First allegedly billed government healthcare programs, Dkt. 11 at ¶¶ 139, 143, the AC "does not plead specific examples of referrals" and "[p]erhaps most striking," is "devoid of any allegation that [the physicians] referred a single *Medicare* [or Medicaid] patient." *Childress*, 2015 WL 13793109, at *4 (emphasis in original).  This deficiency, alone, requires dismissal. *See United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693, 706 (11th Cir. 2014) ("Stated another way, the Defendants' claims had to be for a

specific type of Medicare patient, or a 'patient-specific' referral, in order to be false."). As in *Childress*, "absent any allegations of actual referrals for Medicare patients, [Omni] fails to sufficiently allege a violation of the AKS or the Stark statute." *Id.* at *4.

Even aside from the failure to identify a single actionable referral, the AC's attempts to provide particulars about an alleged scheme miss the mark. Omni alleges, for example, that in May 2013, Paul Miller, the Director of Physician Office Operations for HFMG, emailed that "[i]t is the goal to drive business within the system" and that "effectively [*sic*] immediately we will no longer provide marketing opportunities for competing services." Dkt. 11 at ¶ 81. The AC does not articulate how alleged denials of marketing opportunities for unidentified competing services leads to the submission of "false" payment claims to the government.

Based on "[d]ata published by CMS" tracking referrals from one health care provider to another, the AC also alleges that referrals from MIMA physicians to Health First hospitals dropped 7 percent when MIMA entertained a sale offer from Health Management Associates, LLC, and that those referrals "rebounded" as MIMA "began negotiating its sale to Health First in 2012," increasing further "once the deal was finalized in 2013" and through 2014. Dkt. 11 at ¶¶ 82, 83. Further, 10 of the 12 "highest paid physicians" allegedly increased their referrals to Health First's four hospitals from 2011 to 2014. Dkt. 11 at ¶ 84. The AC provides no factual allegation that those physicians are among Health First's "highest paid" nor does it provide any factual allegation that the physicians' compensation takes into account the volume or value of the physician's referrals, or even the type of referral, which is critical under Stark, as explained *infra*.

Unidentified "doctors who were paid the lowest by Health First also referred the fewest number of patients" from 2011 to 2014. *Id.* at ¶ 86. The "lowest" paid physicians are not identified, nor does any factual allegation support the conclusion that these physicians'

compensation takes into account the volume or value of their referrals.  It is not even clear what the chart embedded in paragraph 86 purports to show.

A chart in paragraph 87 purports to show an increase in referrals by OB/GYN physician referrals to Health First hospitals from 2011 to 2014, but identifies Dr. Grecul, Dr. Mendolla, and Dr. Swain, all of whom the AC earlier alleged are cardiologists, and not OB/GYNs.  *Compare* Dkt. 11 at ¶ 87 *with* ¶¶ 15-17.  A subsequent chart identifies the amounts paid to five OB/GYN physicians in 2013, and the number of unidentified patients allegedly referred by them from 2011 to 2014 to unidentified facilities.  *Id.* at ¶ 88.  Similar charts for cardiologists are contained in paragraphs 89 and 90.  As with the other charts and general allegations, there is no factual allegation that supports the AC conclusion that the compensation of physicians employed by the Health First system was tied to volume or value of referrals, or that any of the alleged patient referrals included patients covered by government health insurance programs.

### 3.      Alleged "Specialty Referrals"

Although titled "specialty referrals," the AC identifies no actual referrals.[9]  Dkt. 11 at ¶¶ 91—119.  Instead, it generally alleges that Health First measures referrals, including those made by Health First to non-Health First entities, productivity, and also profitability of individual healthcare providers.  *Id.* at ¶¶ 91-92.  One of the ways Health First allegedly "encourages its in-house physicians to direct patients to affiliates and affiliated doctors" is "by requiring them to complete a time-consuming jumble of paperwork in order to send cases to outsiders."  *Id.* at ¶ 93.

---

[9]      The "specialty referrals" section also includes "immaterial facts not obviously connected to" an FCA action.  *Weiland*, 792 F.3d at 1322.  These include Dr. Deligdish's complaint that in 2019 a Health First nurse mistakenly informed a patient that Dr. Deligdish did not have privileges at one of Health First's hospitals, and that an anonymous defamatory e-mail was sent to the CEO and board members of Parish Medical Center and "fashioned to appear as if it were on the letterhead of the company operated by Deligdish and signed by the doctor," suggesting that Health First somehow authored the e-mail.  Dkt. 11 at ¶¶ 99-105.

By contrast, "in-house referrals are streamlined, quick electronic transfers of patient care." *Id*. Other purported strategies, like a "centralized scheduling system," also reduce referrals to non-Health First entities. *Id*. at ¶ 96. The AC does not articulate how such allegations, even if true, result in the filing of a false payment claim to a government healthcare program, and generally complains that these alleged practices interfere with patient choice. *Id*. at ¶¶ 106-110. These allegations are simply insufficient to state a claim for an FCA violation.

### 4. General Allegations Regarding Physician Contracts

Absent enumerated exceptions, Health First's physician contracts allegedly encourage physicians to refer patients within the Health First system. Dkt. 11 at ¶ 111-114. No actual executed physician contracts are attached to the AC, not even those of the individual cardiologist and oncologists named as defendants. In 2018, a Health First physician can earn a bonus of up to 3 percent of annual compensation if certain criteria relating to breast cancer screening, colonoscopies, and follow-up plans for patients within a specified BMI range are satisfied, with the physician eligible to "achieve each metric individually." *Id*. at ¶ 115-118. Again, these allegations do not give rise to an FCA violation.

**B.      The AC Does Not Plead A Single Actual "False" Claim With Particularity, Nor Does It Provide Sufficient Indicia of Reliability that an Actual "False" Claim Was Submitted to the Government.**

In addition to pleading an underlying AKS and Stark violation with particularity, the AC must similarly satisfy Rule 9(b) as it relates to an actual "false" claim under the FCA. To do that, the AC must provide sufficient "indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government." *Mastej*, 591 Fed. Appx. at 707 (emphasis in original). This is because "'[t]he act of submitting a fraudulent claim to the government is the '*sine qua non* of a False Claims Act violation.'" *Corsello v. Lincare*, 428 F.3d 1008, 1012 (11th Cir. 2005) (internal citation omitted).

In assessing motions to dismiss in FCA cases, the Eleventh Circuit has consistently refused to infer a false claim was actually submitted to a government healthcare program for payment, and has instead made clear a relator must provide reliable details of the submission of a false claim to the government to satisfy Rule 9(b).  In this regard, in *Clausen*, the Eleventh Circuit held that:

> We cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity or ignoring that the 'true essence of the fraud' of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme.

290 F.3d at 1312 n. 21.

In *Corsello*, the Eleventh Circuit further elaborated on this principle:

> [Relator] argues that a pattern of improper practices of the defendants leads to the inference that fraudulent claims were submitted to the government, but we disagree.  Because it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances. Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims because such an assumption would 'strip [ ] all meaning from Rule 9(b)'s requirements of specificity.' . . . . In short, [Relator] provided the 'who,' 'what,' 'where,' 'when,' and 'how,' of improper practices, but he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government.

428 F.3d at 1013-14.

And it re-affirmed the principle in *McInteer*:

> [the relator] has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims.  He cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement.  Just like the *Clausen* plaintiff, though, [the relator] fails to provide the next link in the FCA liability chain:  showing that the defendants *actually submitted* reimbursement claims for the services he describes.  Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.

470 F.3d at 1359 (emphasis in original).

19

In sum, the Eleventh Circuit does not allow courts to infer the submission of an actual false claim. A relator must provide "exact billing data—name, date, amount, and services rendered," or absent that, make allegations that possess the "required indicia of reliability that a false claim was actually submitted" to the government. *Mastej*, 591 Fed. Appx. at 704. The latter may be satisfied where a relator has "direct, first-hand knowledge of the defendants' submission of false claims gained through [his] employment with the defendants." *Id.* By contrast, a relator "without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation" and similarly "a corporate outsider likely does not have the required access to learn enough about the defendants' billing practices." *Id.*

Here, the AC does not provide any "exact billing data." In fact, it provides no billing data at all. Further, Omni is an outsider—indeed a competitor—unlike the relator in *Mastej*, a former insider who had been the Vice President of Acquisitions and Development for HMA for several years, from 2001 until February 2007, and the former CEO of an HMA hospital. 591 Fed. Appx. at 695, 707. The highly detailed and reliable allegations that satisfied Rule 9(b) in *Mastej* are wholly lacking here.

In contrast to Omni, the relator in *Mastej* identified the financial incentive schemes "in great detail." *Id.* at 705. He gave "the names of the doctors who received the incentives, the names of the Defendants' employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal." *Id.*[10] The allegations also included "specific details" and "specific information" about the two

---

[10]     For example, the *Mastej* relator alleged that the HMA hospital for which he was the CEO entered into on-call contracts with neurosurgeons to provide emergency neurosurgery—even though that hospital did *not* perform emergency neurosurgery, and instead sent patients in need of such emergency surgeries to other hospitals. 591 Fed. Appx. at 699. There is no indication in *Mastej* as to whether the neurosurgeons were HMA employee physicians, or non-employees,

7524485.1

underlying schemes.   *Id.*   For that reason, the Eleventh Circuit observed that the relator's allegations regarding the financial incentives met "Rule 9(b)'s required level of specificity."   *Id.*

But equally critical, the *Mastej* relator's allegations about the actual submission of false claims to the government were based on his "personal knowledge" as a result of his insider status, in contrast to outsider Omni's conclusory allegations that are based on surmise.   *See* 591 Fed. Appx. at 707-708 (noting that "importantly here, [the relator] was not a corporate outsider who only speculated that Defendants must have submitted or paid claims to the government . . . . To the contrary, [the relator] was a Vice President of Defendant HMA . . . . and then CEO of one of th[e] hospitals" at issue).

Notably, while the Eleventh Circuit found the *Mastej* relator's allegations sufficient for the years in which he worked for defendant, it found his allegations about subsequent years deficient. *Mastej*, 591 Fed. Appx. at 709 (holding that "the indicia of reliability that existed while Mastej served as Vice President and then CEO disappeared" once he was no longer an insider); *see also United States ex rel. Fernandez v. Miami Cancer Inst.*, Civil Action No. 17-24051-Civ-Scola, 2019 WL 1993513, at *4 (S.D. Fla. May 6, 2019) ("Unlike the relator in *Mastej*, the Relators do not have any firsthand knowledge or experience with the hospital's billing practices, what percentage of the hospital's patients are enrolled in government funded programs, and whether these fraudulent claims were actually billed."); *United States ex rel. D'Anna v. Lee Mem. Health Sys.*, Case No: 2:14-cv-437-FtM-38CM, 2019 WL 1061113, at *7 (M.D. Fla. Mar. 6, 2019) (dismissing Stark based FCA complaint where relator, though a former insider who audited the hospital's physician compensation, provided "no indication" that she "knew of Lee Health's billing or

---

which is significant for assessing the viability of the AKS and Stark allegations. But the *Mastej* defendants did "not argue that an exception to Stark statute's broad definition of 'financial relationship' applies to the financial-referral incentives alleged in [the] complaint." *Id.* at 698.

referral practices," where "nothing . . . suggests that [relator] ever had access to billing documents or Medicare claims," and where relator simply concluded that "the compensation agreements were 'not commercially reasonable in the absence of referrals.").

In light of the foregoing, the AC has failed to adequately allege that Health First "presented" an actual false claim for payment in alleged violation of 31 U.S.C. § 3729(1)(A).  For the same reason, it has failed to plead a violation of 31 U.S.C. § 3729(a)(1)(B).  *See United States ex rel Fla. Soc'y of Anesthesiologists v. Choudhry,* 262 F. Supp. 3d 1299, 1311 (M.D. Fla. 2017) (dismissing section 3729(a)(1)(B) claim where relator "fail[ed] to identify what 'false record or statement' was made or used, and material, to a false claim). Finally, the AC fails to state a violation of the FCA's conspiracy prong, 31 U.S.C. § 3729(a)(1)(C), because it contains *no* allegations that any of the defendants agreed with one another to violate the FCA, and fails to provide any particulars of the requisite, but unidentified, conspiratorial agreement, including its alleged members and when the conspiracy arose.  *See, e.g., United States ex rel. Chase v. HPC Healthcare*, 723 Fed. Appx. 783, 791 (11th Cir 2018) (affirming dismissal of FCA conspiracy count because relator failed to identify an alleged agreement to defraud the government, the parties to that agreement, or "any specific facts that show an agreement to violate the False Claims Act.").

**C.    The AC Does Not Plausibly State an AKS or Stark Violation.**

Not only does the AC fail to satisfy Rule 9(b)'s heightened pleading requirements, it also fails to satisfy Rule 8's foundational plausibility standard.  To assess plausibility under Rule 8, the Court must review the AC's allegations in tandem with the relevant statutory and regulatory regime because the plausibility analysis is a "context specific" task.  Here, the AC's FCA claims are premised on purported underlying violations of the AKS and Stark—specifically, that Health First's financial arrangements with its *employee* physicians are nothing more than a scheme to

22

refer patients to Health First.  Dkt. 11 at ¶¶ 70-71, 96-97, 120, 129, 132.  Such a theory does not give rise to an AKS or Stark violation.

### 1.  AKS

While the AKS creates liability for knowingly paying "remuneration" to induce a person "to refer an individual for the furnishing . . . of any item or service" for which payment may be made under a government healthcare program, the statute expressly exempts from the definition of "remuneration" "*any amount* paid by an employer to an employee . . . for employment in the provision of covered items or services." 42 U.S.C. §§ 1320a-7b(b)(2)-(b)(3)(B) (emphasis added).[11]  As such, the AC's bare-bones allegations that Health First violated the AKS, and in turn the FCA, because it paid employee physicians is a non-starter that cannot satisfy the plausibility standard given the "obvious alternative explanation" indicative of "lawful conduct."  *See Cigna Corp.*, 605 F.3d at 1290; *Keeler*, 568 Fed. Appx. at 793-94 (observing the court had previously dismissed a complaint because it "did not describe how the alleged kickbacks 'crossed the line from legal conduct in compliance with federal statutes to illegal kickbacks.'") (internal citation omitted).[12]

---

[11]    A similar regulatory exemption to the definition of "remuneration" under the AKS also exists. *See* 42 C.F.R. § 1001.952(i) ("[R]emuneration does not include . . . *any amount* paid by an employer to an employee. . .  for employment in the furnishing of any item or service for which payment may be made" under a federal healthcare program.") (emphasis added).

[12]    *See also Hericks v. Lincare, Inc.*, Civil Action No. 07-387, 2014 WL 1225660, at *7 n. 17 (E.D. Pa. Mar. 25, 2014) (granting a motion to dismiss and noting that "[b]ecause the safe harbor language applies to payment to individuals for employment in the provision of covered items and services, and because the Lincare employees are employed in the provision of covered items and services, the cash bonuses for referrals are not necessarily illegal remuneration in violation of the Anti-Kickback Statute, providing an additional reason for the Court to dismiss this claim."); *Carrel v. AIDS Healthcare Foundation, Inc.*, 898 F.3d 1267, 1272-75 (11th Cir. 2018) (affirming summary judgment dismissal of FCA claims relating to payments to employees under the AKS's employee exception).

7524485.1

2.     **Stark**

Broadly speaking, Stark "prohibits doctors from referring Medicare patients to a hospital if those doctors have certain types of 'financial relationships' with that hospital," and prohibits "that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients."   *Mastej*, 591 Fed. Appx. at 698 (citing 42 U.S.C. § 1395nn(a)(1)(A)-(B)).  Like the AKS, Stark also exempts from its scope certain compensation arrangements, including those for physicians employed by a hospital.  *See D'Anna*, 2019 WL 1061113, at *3 ("Certain compensation arrangements are exempted from . . . Stark[ ]'s prohibition . . . . [and] bona fide employment relationships . . . are not financial relationships that preclude referrals.").

Stark's statutory bona fide employee exemption, 42 U.S.C. §§ 1395nn(a)(2)(B), 1395nn(e)(2), and its regulatory companion, 42 C.F.R. § 411.357(c), permit hospitals to pay physician employees for services so long as the compensation is consistent with fair market value of the services, is not determined in a manner that directly or indirectly takes into account the volume or value of any referrals by the physician employee, and is commercially reasonable even if no referrals were made to the hospital employer.  Further, Stark does not prohibit the payment of a productivity bonus based on services personally performed by the physician.  *See* 42 U.S.C. § 1395nn(e)(2)(D); 42 C.F.R. § 411.357(c)(4).  In other words, a hospital can pay an employee physician who refers patients to the hospital so long as certain criteria are satisfied.

The AC, however, provides no plausible basis upon which to conclude that there has been any Stark violation.   Instead, it makes only conclusory allegations about Health First's compensation to its *employees* that lack even a scintilla of factual support.  For example, the AC summarily alleges that Health First paid its employee physicians in a manner that took into account

24

the volume or value of their referrals to Health First, but provides no factual support for that allegation.

The AC also fails to distinguish generic referrals from Stark-implicated referrals. Significantly, not every referral is a "referral" under Stark, which by definition is limited to fourteen (14) enumerated "designated health services" ("DHS") found in 42 U.S.C. § 1395nn(h)(6). Further, a DHS does not include services that Medicare reimburses as part of a "composite rate," 42 C.F.R. § 411.351 (definition of DHS), and the definition of "referral" itself excludes, *inter alia*, any DHS personally performed or provided by the referring physicians. 42 C.F.R. § 411.351 (definition of "referral"). Yet, the AC generically uses the term "referrals" without specifying the *type* of referrals, thus failing to distinguish any referral from Stark-implicated ones. Only the latter implicate Stark, and the AC's legal conclusion that "all referrals" are implicated undercuts entirely the plausibility of those allegations. Under *Iqbal*, the Court should not credit such conclusory allegations.

## II.   **OMNI LACKS STANDING TO PURSUE THIS ACTION.**

This lawsuit is not the first brought by Omni and Dr. Deligdish against Health First. In each of the two prior lawsuits, Dr. Deligdish and Omni broadly released claims against Health First and all of the individual defendants that pre-date June 9, 2017. Those releases require dismissal of all such claims Omni has brought here. *See, e.g., United States ex rel. Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*, Case No. 07-80323-CIV-Middlebrooks/Johnson, 2009 WL 10667702 (S.D. Fla. Mar. 24, 2009) (granting 12(b)(1) motion to dismiss with prejudice relator's FCA complaint due to lack of standing arising out of a general release the relator executed in a state court action).

In the Antitrust Suit, both Omni and Dr. Deligdish agreed to broadly "release" and "forever discharge" Health First and its "past, present, and future officers . . . employees, subsidiaries [and]

7524485.1

affiliates . . . of  and for **any and all** . . . causes of actions, . . . suits . . . [and] claims and demands . . . [they] "had, **now have, [and] may have**" against all releasees "**from the beginning of the world to the day of these presents.**"[13] *See* Exh. A at p. 2-3[14] (emphasis added).  Further, they agreed that the "General Release, Hold Harmless Agreement and No Lien Affidavit," signed by Dr. Deligdish for himself and on Omni's behalf, "constitute[d] an accord and satisfaction of any and all claims and causes of action released herein including the claims described above that were, could have been or could be brought by the Plaintiffs against the Defendant Releasees . . . ." *Id.* at 8-9, 16, 19.  The Antitrust Suit settlement agreement was fully executed on December 13, 2016. *See id.* at 16-35.  As such, under this settlement agreement, any and all claims that pre-date December 13, 2016, the date on which the settlement agreement was fully executed, have been released.

Furthermore, with the United States' consent,[15] Dr. Deligdish settled the Doe FCA Suit on June 9, 2017 "for himself and for his . . . **agents**," releasing "**all** of his claims, **known or unknown**, that were or **could have been brought**, against the Health First Defendants in this action."  *See* Exh. B at ¶ 8.  That broad release, "in particular . . . forever discharge[d] Health First, Inc." and its "**past, present, and future officers . . . employees, subsidiaries, [and] affiliates**" from "any and all" actions, suits, and claims whatsoever "from the beginning of the world to the date of this

---

[13]    The release provision goes on to include examples of the types of actions covered by the release.  However, that provision of the agreement, which begins "This Release includes . . ." does not limit the broad release quoted herein.  See *United States v. Hastie*, 854 F.3d 1298, 1304 (11th Cir. 2017) ("The list of examples is not exclusive because it is preceded by the word 'including'.") The term "'including' signals a list of examples and not an exclusive definition."  *Id.*

[14]    The page references to Exhibits A and B are to the docket pages on the CM/ECF system.

[15]    In the Doe FCA Suit, the United States consented to the settlement, which was without prejudice to any claims the United States may have had.  *See* Doe FCA Suit, Dkt. 144.  The United States had declined to intervene in that case. *See* Doe FCA Suit, Dkts. 10, 96.

7524485.1

agreement is [*sic*] executed,[16] specifically based upon or arising out of the allegations of the First Amended Complaint . . . filed by Relator on October 1, 2015." *Id.* (emphasis added).

Here, the AC alleges that Dr. Deligdish is Omni's principal, meaning that Omni is Dr. Deligdish's agent for purposes of this lawsuit.  Dkt. 11 at ¶ ¶ 7, 99.  As such, when Dr. Deligdish released all of his claims, including unknown ones, in the Doe FCA Suit, he did so on his own behalf as well as his "agent" Omni.  The phrase "in particular," which follows the release, does not limit the types of claims released—nor could it, since the release includes "unknown" claims. Instead, that phrase simply specifies that among the released claims are those "specifically based upon or arising out of the allegations of the First Amended Complaint filed by Relator on October 1, 2015."

Further, the Doe FCA Suit's First Amended Complaint alleged that Health First violated the AKS and Stark, which resulted in the submission of allegedly false claims to the government. *See* Doe FCA Suit, Dkt. 61.  Those are the *same* allegations Omni repeats in this case, and involving the same (albeit unidentified) claims for payment that Omni again alleges are false.[17] Thus, under the Doe FCA Suit settlement, further claims between December 13, 2016 through and including June 7, 2017, have been released.

Under either and both of these releases, Omni not only lacks standing to pursue actions against Health First on its own behalf, but also to pursue this action on behalf of the United States and the State of Florida.  *See United States ex rel. Whitten v. Triad Hosp., Inc*., Case No Civ. A-CV-202-189, 2005 WL 3741538 (S.D. Ga. Oct. 27, 2005).  In *Whitten*, a relator entered into a

---

[16]     Paragraph 19 of the Doe FCA Suit Settlement Agreement defined its "Effective Date" as "the date of signature of the last signatory to the Agreement." All parties to the agreement signed it on June 9, 2017.  *See* Exh. B at p. 14-16.
[17]     Indeed, in the *Parties' Joint Notice of Pendency of Other Actions*, Omni acknowledged that both the Doe FCA Suit and the Antitrust Suit are related to this suit.  Dkt. 40.

7524485.1

severance agreement with his former employer containing a broad release, and then subsequently filed an FCA suit.  *Id.* at \*2.  The district court interpreted the release provisions to include the release of another entity, named Quorom, and rejected the relator's public policy argument that the release could not be enforced to prevent him from serving as a relator to pursue claims on behalf of the government.  *Id.* at \*4-5.

Distinguishing *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir 1994), which held a release unenforceable to bar a relator from pursuing FCA claims on the government's behalf, the district court observed that "in reaching its conclusion, the *Green* court did not consider whether a relator who has signed a release ought to be able to *maintain* a *qui tam* action in cases where the government has declined to intervene." *Id.* at \*4 (emphasis in original).  The district court reasoned that "[a]t least in cases where the government has declined to intervene, public policy favors the enforcement of agreements" and that "[t]he public policy interest identified in *Green*, encouraging disclosure of allegations of fraud against the government, is served adequately by a rule that prohibits a litigant who has agreed to release his right to serve as a relator from maintaining a *qui tam* if the government declines to intervene in the action." *Id.* at \*5.  Accordingly, the district court in *Whitten* dismissed the relator's claims pursuant to Rule 12(b)(1). *Id.* at \*1.[18]

Applied to this case, where the government has declined to intervene, this "rule has the merit of encouraging those with relevant information concerning fraud against the government to

---

[18]     On appeal, the Eleventh Circuit reversed on other grounds, finding that the district court erred when it interpreted the scope of the release to include Quorom.  *United States ex rel. Whitten v. Triad Hosp., Inc.*, 210 Fed. Appx. 878, 882 (11th Cir. 2006) (finding that "[s]ince Quorom is clearly referred to as a separate entity from the Releasees, the plain language of these two paragraphs indicates that Quorom is not intended to be one of the Releasees.").  The Eleventh Circuit, however, did not address the district court's public policy reasons for enforcing releases entered into by relators where the government has not, as here, intervened.

come forward, without unduly rewarding litigants that seek to renege on their agreements." *Whitten*, 2005 WL 3741538, at \*5.  But as the AC's factual allegations summarized *supra* make clear, Omni seeks to pursue claims based on alleged incidents that the AC itself alleges occurred, in large part, prior to the effective date of the releases in the Doe FCA Suit (June 9, 2017) and the Antitrust Suit (December 13, 2016).  The law simply does not permit Omni to press the rewind button to litigate over these alleged incidents.

The only standing Omni may have is for claims based on alleged conduct that occurred after the releases' effective dates—June 9, 2017 under the Doe FCA Suit Settlement Agreement and December 13, 2016 for the Antitrust Suit release.  The AC, however, makes only a few conclusory allegations about purported post-release conduct in paragraphs 111, 115, 133-134 (generally, 2017), 115 (2018), and 77, 97-99, 101 (2019), none of which, standing alone or collectively, suffice to state an FCA claim under Rule 8 or Rule 9(b).  *See* sections I.A., B & C., *supra*.

## III.   THE AC SHOULD BE DISMISSED UNDER THE PUBLIC DISCLOSURE BAR.

In addition to the foregoing bases for dismissal, the FCA's public disclosure bar also requires dismissal of the AC.[19]  That provision requires dismissal of any case that is "substantially the same" as "allegations or transactions" that were "publicly disclosed" in, among other things, a "Federal . . . civil. . . hearing in which the Government or its agent is a party," or a "Federal report, hearing, audit, or investigation."  31 U.S.C. § 3730(e)(4)(A).[20]

---

[19]      This basis for dismissal only applies to the FCA.  Unlike the FCA, the FFCA does not have a public disclosure bar provision.

[20]      The Patient Protection and Affordable Care Act amended this provision in 2010, *inter alia*, to add "unless opposed by the Government." *See* Pub. L. No. 111-148, § 10104(j)(2), 124 Stat 119, 829 (2010).  Courts have interpreted this to mean that the government can file an opposition to a defendant's motion to dismiss on public-disclosure-bar grounds, in which case "the court does not even address the issue."  *United States v. Select Med. Corp.*, No. 3:12-cv-00051(RLY-DML), 2017

7524485.1

Here, the AC alleges that Health First awarded medical directorships to its employee physicians to pay them for little to no work in exchange for referrals.  Subject to the Court's solicitation of the Government's position, the AC should be dismissed under the public disclosure provision because Dr. Deligdish made substantially the same allegations in the now-dismissed Doe FCA Suit.  *See* FCA Doe Suit, Dkt. 61 at ¶ ¶ 87-98.

Dr. Deligdish alleged in the Doe FCA Suit that Health First appointed MIMA physicians to medical directorships and "paid these doctors significant stipends for little to no work." FCA Doe Suit, Dkt 61 at ¶ 88.  He further alleged that various medical directorships to different MIMA physicians resulted in an increase in allegedly improper referrals to Health First through "mid-2015."  *Id.* at ¶ ¶ 94-95.  These allegations are substantially similar to the generic and generalized medical directorship allegations Omni makes now.  *See* Dkt. 11 at ¶ ¶ 2, 47, 56-59.  Further, Omni relies on "[d]ata published by CMS track[ing] referrals from one health care provider to another," *i.e.*, a "Federal report," in an attempt to bolster his claim that medical directorships, and other purportedly improper practices, led to allegedly improper referrals to Health First.  *Id.* at ¶ 82.  Omni used that publicly available CMS data to summarize alleged "spikes" in referrals from various physicians to Health First from 2010 to 2014.  *Id.* at ¶ ¶ 83-88.

As amended, § 3730(e)(4) "creates grounds for dismissal for failure to state a claim," and "instructs courts to dismiss an action when the public disclosure provision applies."  *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015).  *Osherhoff* applied a three-part test to affirm dismissal of a FCA suit based on the public disclosure provision: (1)  have the allegations made by relator been publicly disclosed; (2) if so, are the allegations in relator's

---

WL 468276, at *4 (S.D. Ind. Feb. 3, 2017) (collecting cases).  The government will be served electronically with this motion.

complaint substantially the same as the allegations or transactions contained in the public disclosures; and (3) if yes, is the relator an original source of the information.  *Osheroff*, 776 F.3d at 812 (citing *Cooper v. Blue Cross Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994)).

### A.    The AC's Allegations Have Been Publicly Disclosed.

Under § 3730(e)(4)(i), the public disclosure must occur "in a federal proceeding in which 'the Government or its agent is a party.'"  *United States ex rel. Gilbert v. Virginia College, LLC*, 305 F. Supp.3d 1315, 1321 (N.D. Ala. 2018) (finding that a "relator is indeed an 'agent' of the Government under § 3730(e)(4)(a)(i)" and concluding that "because the Government is the real party in interest, *qui tam* relators are 'agents' of the government.").  Those disclosures include documents produced in discovery to a relator in a prior federal proceeding.  *See McElmurray v. Consolidated Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1253 (11th Cir. 2007) ("We agree . . .  that these documents . . . were apparently obtained as part of discovery in Appellants' individual lawsuits against Augusta, because they have so implied in their complaint.  We further agree that if these documents were acquired during discovery in previous lawsuits, then they constitute a 'public disclosure' under section 3730(e)(4)(A).").[21]  Further, a public disclosure also includes "allegations *or transactions*" that have been publicly disclosed in a "Federal report."  31 U.S.C. § 3730(e)(4)(A)(ii) (emphasis added).   By Omni's admission, the AC relies on data published by CMS to identify generic referrals from certain physicians to Health First.  Dkt. 11 at ¶ 82.  At least one court has concluded that published CMS data constitutes a public disclosure.  *See United States ex rel. Integra Med Analytics LLC v. Providence Health & Svs.*, Case No. CV

---

[21]    In *McElmurray*, the relators obtained discovery in a state court action, which they then used to pursue their FCA action.  501 F.3d at 1252.  The 2010 amendment to section 3730(e)(4) limited the definition of public disclosures in litigation to Federal actions.

7524485.1

17-1694 PSG (SSx), 2019 WL 3282619, at *5-8 (C.D. Cal. July 16, 2019) (holding that Medicare claims data constitutes a federal report under section 3730(e )(4)(A)(ii)).[22]

Here, the first *Cooper* prong is satisfied because the AC's allegations have been previously disclosed in a prior federal action.   Specifically, Dr. Deligdish, acting as an agent of the Government in the Doe FCA Suit, sued Health First over allegedly improper medical directorships to induce referrals to Health First through mid-2015.   Now, Omni has regurgitated Dr. Deligdish's prior allegations, complaining that unspecified medical directorships purportedly caused "spikes" in referrals through 2014—the latter of which Omni bases on publicly available CMS data.

**B.      The AC Is Based on Publicly Disclosed Information.**

The second prong of the *Cooper* test "asks whether the disclosed information forms the basis of the plaintiff's lawsuit." *Osheroff*, 776 F.3d at 814.  This, in turn, simply requires the Court to determine whether Omni's allegations are based "*in any part* on . . . publicly disclosed information. . . ." *Id.* (emphasis in original).  This prong is described as 'a quick trigger to get to the more exactly original source inquiry.'" *Id*. at 814 (internal citation omitted).  Here, that trigger is satisfied: Omni's medical directorship allegations are based "at least 'in . . . . part'" on the publicly disclosed allegations made in the Doe FCA Suit, are substantially similar to them, and are also based on publicly available CMS data.  *Id.* (internal citation omitted).

**C.      Omni Is Not an Original Source.**

The final *Cooper* prong asks whether the relator "is an original source of the information" contained in the AC.  *Osheroff*, 776 F.3d at 814.  To qualify as an "original source" Omni must

---

[22]      *But see United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare, Inc*., Civil Action No. SA-17-CV-1249-XR, 2019 WL 5970283, at *8-9 (W.D. Tex. Nov. 13, 2019) (holding that Medicare claims data does not constitute a federal report under section 3730(e)(4)(A)(ii)).

7524485.1

have "knowledge that is *independent of* and *materially adds to the publicly disclosed allegations or transactions.*"[23] 31 U.S.C. § 3730(e)(4)(B) (emphasis added).  The AC provides no allegation under Rule 8 that permits the Court to plausibly conclude that Omni's "knowledge" of the alleged medical directorships is "independent" of those previously disclosed by Dr. Deligdish in the Doe FCA Suit.

In this vein, the AC summarily alleges that Omni is "an original source." ECF No. 1 at ¶ 32.  Omni's allegations, in turn, are "based on the personal observation of Relator Omni's principal [Dr. Deligdish], as well as documents and information in his possession." Dkt. 11 at ¶ 7. The AC does not allege that Dr. Deligdish worked at Health First during the relevant time period, and does not identify the provenance of documents and information "in his possession."  *Id.* at 7. Absent some affirmative allegation identifying the provenance of the documents possessed by its principal, Omni cannot satisfy the Court that it did not obtain those documents in discovery during the Doe FCA Suit.[24]  In any event, Omni's knowledge cannot be "independent" from Dr. Deligdish's "knowledge," since all of Omni's allegations are based on what Dr. Deligdish claims to know.  *Id.* at ¶ 7.

---

[23]     The other manner of qualifying as an original source is not applicable here.  Under 31 U.S.C. § 3730(e)(4)(B), "an original source" may also be an individual who "prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." The public disclosures about the medical directorships were made in the Doe FCA Suit in October 2015 (Doe FCA Suit, Dkt 61), meaning that the information voluntarily disclosed to the Government when filing the instant suit in 2019 did not occur prior to the October 2015 public disclosure.  *See United States ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp.3d 1288, 1297 (M.D. Fla. 2018).

[24]     *See supra* p. 5 n. 5, citing to filing in Doe FCA Suit indicating Health First produced over five (5) million pages of documents to Dr. Deligdish in discovery.

Further, Omni's allegations add no material "facts" about allegedly improper medical directorships previously disclosed in the FCA Doe Suit. Not surprisingly, as an outsider, Omni has no information beyond what it obtained through the prior suit.

Last, Omni is not an original source as it relates to the "transactions," *i.e.*, referrals disclosed by the CMS data, because it alleges no firsthand knowledge of any of those alleged referrals. At most, Omni has "secondhand" knowledge of referrals, and that knowledge derives from the CMS data. The Eleventh Circuit has made clear that "secondhand knowledge" does not suffice to afford a relator "original source" status. *See United States ex rel. Saldivar v. Fresenius Medical Care Holdings*, 841 F.3d 927, 935-37 (11th Cir. 2016).

## CONCLUSION

This action is the epitome of vexatious litigation. The Court should put an end to Omni's and Dr. Deligdish's litigation fixation with Health First, and dismiss this suit with prejudice as to Omni, and without prejudice as to the United States and the State of Florida.

Dismissal with prejudice is warranted because any attempt to amend would be futile. *See, e.g., Vanderberg v. Donaldson,* 259 F.3d 1321, 1326-27 (11th Cir. 2001); *Mercer v. North Broward Hosp. District*, 270 Fed. Appx. 789, 791 (11th Cir. 2008). First, Relator has already had two bites at the apple, and a third bite is not warranted. Prior to filing this action, 31 U.S.C. § 3730(b)(2) required Omni to serve on the government "[a] copy of the complaint *and written disclosure of substantially all material evidence and information the person possesses.*" (emphasis added). Accordingly, "all material evidence and information" Omni possesses has presumably been included in full in the AC, which is its *second* complaint. Having reviewed that "material evidence and information," the United States and Florida have nevertheless declined to intervene. Second, a third complaint will not cure Omni's lack of standing as a relator to pursue claims in

34

this non-intervened FCA action precisely because Omni and its principal released any claims they had based on conduct that allegedly occurred prior to June 9, 2017.  Here, the majority of the AC's allegations refer to diffuse and vague "incidents" that occurred before 2017, and none of which Omni has standing to pursue.  *See* Dkt. 11 at ¶ ¶ 50-53, 58, 66, 71, 74, 77, 78, 81-88, 90, 120-121, 126-127.  Finally, a third complaint will not cure the fact that Omni's case is barred by the public disclosure bar.

For the foregoing reasons, Defendants Health First, Inc. and Health First Medical Group, LLC, respectfully request that this Court dismiss Omni's Amended Complaint with prejudice, and permit recovery of reasonable attorneys' fees, costs, and expenses in defending this action pursuant to 31 U.S.C. § 3730(d)(4).

Dated:  October 30, 2020                              Respectfully submitted,

Robert T. Rhoad*                           /s/ Marcos E. Hasbun
District of Columbia Bar No.456535          Marcos E. Hasbun
rrhoad@nicholsliu.com                       Fla. Bar No. 0145270
Andy Liu*                                   mhasbun@zuckerman.com
District of Columbia Bar No. 454986         ZUCKERMAN SPAEDER LLP
aliu@nicholsliu.com                         101 E. Kennedy Blvd.
NICHOLS LIU LLP                             Suite 1200
700 Sixth St. NW                            Tampa, FL 33602
Suite 430                                   Tel: (813) 221-1010
Washington, D.C. 20001                      Fax: (813) 223-7961
Tel: (202) 846-9800
Fax: (202) 379-9150

*admitted pro hac vice

Counsel for Defendants Health First, Inc. and Health First Medical Group, LLC

7524485.1

## <u>RULE 3.01(g) CERTIFICATION</u>

On October 23, 2020, Marcos E. Hasbun, counsel for Health First, Inc. and Health First Medical Group, LLC, conferred with David Scher, counsel for Omni, regarding the pleading deficiencies in the Amended Complaint.  Counsel for Omni responded that Omni presently did not have additional allegations to make with respect to the pleading deficiencies identified in this motion.

/s/ Marcos E. Hasbun
Marcos E. Hasbun

7524485.1