# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO, FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* OMNI HEALTHCARE, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | **CASE NO: 6:19-cv-02237-RBD** |
| v. | ) ) | |
| HEALTH FIRST, INC.; HEALTH FIRST MEDICAL GROUP, LLC; STEVEN JOHNSON; JOSEPH FELKNER; DREW RECTOR; LEONARD GRECUL; MARK MENDOLLA; THOMAS SWAIN; STEVEN KARAS; ENRIQUE POLANCO; JOSEPH McCLURE; LEE SCHEINBART; SIMON VINARSKY; MATTHEW GERRELL; AMIT BAROCHIA; ROBERT SPRAWLS; ASISH DALAL; JOHN BOMALASKI; GERMAINE BLAINE; FIRAS MUWALA; RITESH PATIL; GRAINGER STEELE LANNEAU; JAMES NEEL; and JEFFREY STALNAKER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## SECOND AMENDED *QUI TAM* COMPLAINT

---

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of the United States of

America and the State of Florida, brings this action against Health First, Inc. ("Health First") and

Health First Medical Group, LLC ("HFMG"), and the above-named individuals ("collectively

Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"),

the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, the Anti-Kickback Statute, 42 U.S.C.

§ 1320a-7b ("AKS"), and the Stark Act, 42 U.S.C. § 1395nn ("Stark").

## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United

States arising from false and/or fraudulent statements, records, and claims made by Defendants.

The allegations involve the manipulation of physician compensation to reward doctors for the

value and volume of their referrals, in violation of the FCA, AKS, and Stark statutes.

2.      As explained in greater detail herein, during the time period of at least June 10,

2017, through the present, and continuing into the future on an ongoing basis, Defendants were

and are responsible for conspiring to: (1) manipulate key elements of physicians' pay formulas to

reward doctors with high numbers of referrals to Health First; (2) arbitrarily increase

compensation for physicians with high numbers of referrals to Health First; (3) add paid medical

directorships—often for services not provided—as a way of compensating physicians with high

numbers of referrals to Health First; (4) pay physicians as much as five times the average stipend

for supervising mid-level providers; (5) reward physicians with bonuses based on the value and

volume of designated health services including chemotherapy and other drugs; (6) compensate

physicians for surgical referrals to Health First's hospitals; (7) base the conversion factor used to

calculate physician pay on the basis of referrals and the financial contribution a doctor's work

made to the healthcare system; (8) use work performed by mid-level providers as a way of

increasing physicians' pay; and (9) engage in a scheme to exclusively purchase chemotherapy

and other drugs in return for upfront payments, or prebates.

3.      Health First's questionable practices over the last decade have led to numerous

lawsuits, as the healthcare system—as one court put it—"flexed its muscles in the long-running

'scorched earth' turf war for Brevard County's healthcare business." In an effort to tighten Health First's grip on the market and to bolster its finances, Defendants worked together to engage in practices that led to purposefully billing federal health care programs for claims which were tainted by violations of the AKS and Stark, and which violated the FCA.

4.      The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, and $10,781 to $21,563 for each such claim submitted after November 2, 2015, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendant. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

5.      Pursuant to the FCA, Relator seeks to recover on behalf of the United States' damages and civil penalties arising from Defendants' violations of the Stark and AKS statutes and purposeful submission of false and/or fraudulent claims to the Government.

## PARTIES

6.      The United States is the real party of interest in this action.

7.      Relator Omni Healthcare, Inc. is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice, and many medical and sub-specialties. The facts alleged within are based on the personal observation of Relator Omni's principal, as

well as documents and information in his possession. The information and observations led

Relator to question Defendants' fraudulent actions.

8.      Defendant Health First, Inc. ("Health First") is headquartered at 6450 US

Highway 1, Rockledge, FL  32955. Health First is an integrated health system that owns four

hospitals (Holmes Regional Medical Center, Palm Bay Hospital, Cape Canaveral Hospital, and

Viera Hospital). It also now owns the largest multi-specialty physician group in Brevard County,

after acquiring the practice formerly known as Melbourne Internal Medicine Associates, P.A.

("MIMA"). MIMA is now known as Health First Medical Group LLC.

9.      Defendant Health First Medical Group LLC ("HFMG") is headquartered at 6450

US Highway 1, Rockledge, Florida  32955. HFMG is the successor entity to MIMA, which

Health First acquired in February 2013.

10.     Defendant Steven Johnson has been the CEO of Health First since 2011. He is the

principal architect of the programs that rewards doctors for directing business to the healthcare

system to increase revenues and returns.

11.     Defendant Joseph Felkner was the former CFO of Health First. He was the

primary negotiator for Health First in the acquisition of one of the area's largest medical

practices.  He provided detailed financial analysis related to charges for physician services and

the effects of various programs, including referrals.

12.     Defendant Drew Rector is the chief strategy officer at Health First. He played a

critical role in developing the healthcare system's strategy to recruit and reward doctors, which

led to the corrupt practices detailed herein.

13.     Defendant Jeffrey Stalnaker is the CEO of HFMG. Under his direction, the

medical group designed, developed, and implemented policies and procedures that enabled the

schemes described herein to reward physicians and increase revenue in contradiction to federal law.

14.     Defendant Matthew Gerrell, Senior Vice President of Strategy for Health First and CEO of Health First Health Plans, was responsible for developing and implementing strategies for the continued success of the integrated delivery network.

15.     Defendant Leonard Grecul, a member of HFMG, is among the highest paid cardiologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

16.     Defendant Mark Mendolla, a member of HFMG, is among the highest paid cardiologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

17.     Defendant Thomas Swain, a member of HFMG, is among the highest paid cardiologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

18.     Defendant Steven Karas, a member of HFMG, is among the highest paid cardiologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

19.     Defendant Enrique Polanco, a member of HFMG, is among the highest paid cardiologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

20.     Defendant Joseph McClure, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

21.     Defendant Lee Scheinbart, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

22.     Defendant Simon Vinarsky, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

23.     Defendant Firas Muwalla, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

24.     Defendant Grainger Steele Lanneau, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

25.     Defendant Ritesh Patil, a member of HFMG, is among the highest paid gynecologic oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

26.     Defendant James Neel, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

27.     Defendant Richard "Duff" Sprawls, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

28.     John Bomalaski, a member of HFMG, is among the highest paid gynecologic oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

29.     Defendant Ashish Dalal, a member of HFMG, is among the highest paid oncologists in the country pursuant to the strategy that the healthcare system engineered, and he adopted as described herein.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

31.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida.

32.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all Defendants can be found in, reside in, and/or have transacted business in the Middle District of Florida.

33.     Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions for the time period at issue. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## REGULATORY OVERVIEW

### The Federal and Florida False Claims Acts

34.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the

Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1).

35.    The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id*.

36.    In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

37.    The Florida False Claims Act, Fla. Stat. § 68.081 *et seq*., is modeled after the Federal FCA, and contains provisions similar to the ones quoted above. Relator asserts claims under the Florida FCA for the Medicaid false claims alleged in this Complaint.

**The Anti-Kickback Statute**

38.    The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce referrals of items or services paid for by Government health care programs. Specifically, the AKS provides:

(1)    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

(B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program;

(2)    whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person;

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

(B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . . 42 U.S. C. § 1320a-7b(b).

39.    Specific intent is not required to establish a violation of the AKS. 42 U.S.C. § 1320(a)-7b(h).

40. A "Federal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The AKS applies to funds received by Defendants from programs including Medicare, Medicaid, TRICARE and the Veterans Administration.

### Violations of the AKS Can Form the Basis of FCA Liability

41. Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. Courts have held that a person or entity that violates the AKS and subsequently submits a claim for payment or causes another to do so has violated the FCA, regardless of what form the claim or statement takes. Courts have reasoned that such claims are false because there is a false certification attached to them—either express or implied—as to compliance with the AKS each time a tainted claim is submitted.

42. Defendants violated the AKS by offering remuneration and incentives, in various forms, to physicians to induce them to make referrals to Health First facilities for health services payable by Medicare. Medicare does not cover services that are provided because of illegal inducements. All claims for payment for those services are false.

43. In 2010, under the Patient Protection and Affordable Care Act, Congress amended the AKS to expressly clarify that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.

### The Stark Act

44. The Stark Act, 42 U.S.C. § 1395nn, states that if a physician or member of his immediate family has a "financial relationship" with an entity providing healthcare services:

> (a) the physician may not make a referral to the entity for the furnishing of designated health services, and

10

(b) the entity may not present or cause to be presented a claim under this

subchapter or bill any individual, third party payor, or other entity for

designated health services furnished pursuant to a referral prohibited under

subparagraph (A), 42 U.S.C. § 1395nn(a)(1).

45.      The regulations implementing the Stark Act state that a "financial relationship"

may include "a direct or indirect compensation arrangement . . . with an entity that furnishes

[designated health services]." 42 C.F.R. § 411.354(a)(1)(ii). A "compensation arrangement" can

be "any arrangement involving remuneration, direct or indirect, between a physician . . . and an

entity." *Id.* at § 411.354(c).

### Violations of Stark Can Form the Basis of FCA Liability

46.      Compliance with Stark is a precondition for payment from Medicare.

47.      Each claim submitted to Medicare for reimbursement of health services provided

to beneficiaries is accompanied by an express or implied certification that the transaction is not

in violation of federal or state statutes, regulations, or program rules. Falsely certifying

compliance with Stark or AKS in connection with a claim submitted to a federally-funded health

care program is actionable under the FCA.

### ALLEGATIONS

### Relator, Through Its Owner Is a Premiere Expert in the Health Care Field

48.      Dr. Craig Deligdish[1] ("Dr. Deligdish") is part owner and founder of Relator entity

Omni Healthcare, Inc.

---

[1] Relator's personal knowledge is identical to and used interchangeably with the personal
knowledge of Dr. Deligdish to avoid confusion.

49.     Dr. Deligdish began attending college at Cornell University at age 16, continuing his education at Johns Hopkins University where he graduated in three years.  He was committed to becoming a scientist and attended the New York University School of Medicine as an MD-PhD candidate, spending time at the National Cancer Institute where he served as an ensign in the Public Health Service at age 22.

50.     Following his graduation from medical school, Dr. Deligdish completed his internship and residency in internal medicine at Parkland Memorial Hospital, The Dallas VA Medical Center, and The University of Texas Southwestern Medical School, where he was presented with the John Miller Award as the outstanding resident in his class.  Dr. Deligdish's attendings included Joe Goldstein, M.D., who was awarded the Nobel Prize in 1986. His letter of recommendation for his fellowship stated that he was the best internal medicine resident that Dr. Goldstein had ever supervised in his years as an attending physician at the University of Texas Southwestern and Harvard Medical School.

51.     Following his internship and residency, Dr. Deligdish joined the faculty of the University of Texas Southwestern Medical School as the Chairman of the Department of General Internal Medicine at the Dallas VA Medical Center where he also served as the Associate Chief of Staff of Ambulatory Care at the same institution. The Dallas VA Medical Center is currently the second largest VA Medical System in the United States. Dr. Deligdish is the youngest physician in the history of the Veterans Administration to hold such a senior position.

52.     Subsequently, Dr. Deligdish completed his fellowship in medical oncology and hematology at the Dana Farber Cancer Institute, The Brigham & Woman's Hospital, and Harvard Medical School, where he completed his training in molecular virology.

53.     Following his fellowship, Dr. Deligdish joined the faculty of Harvard Medical School prior to relocating to Melbourne, Florida, in 1988.

54.     Upon his relocation, Dr. Deligdish began his own practice. He obtained privileges at Holmes Regional Medical Center and Wuesthoff Hospital. At the time there were only four hospitals in Brevard County, whereas today there are seven.

55.     After just two years at Holmes Regional Medical Center, Dr. Deligdish was awarded the Doctor with the Biggest Heart Award. This award was given by the medical staff and employees at Holmes Regional Medical Center. He founded the Tumor Board at Holmes Regional Medical Center, initiated a clinical trials program, and was the Chairman of the Cancer Program for more than a decade until his hospital privileges were revoked by the Board of Directors of Health First in 2011.

56.     In 1994, Dr. Deligdish and Scott Seminer, M.D. co-founded Omni Healthcare. Initially there were three physicians in the group, which expanded during the ensuing 15 years to include nearly 70 providers in the specialties of surgery, internal medicine, family practice, pediatrics, OB/GYN, and radiology, as well as nearly all of the subspecialties of pediatrics, internal medicine, and surgery.

57.     Recently, Omni Healthcare was one of 100 organizations in the United States awarded a Medicare Direct Contract by the Centers for Medicare and Medicaid Services. In doing so, Omni Healthcare developed an affiliation with the Cleveland Clinic and as a result of its affiliation with Parrish Medical Center is part of the Mayo Clinical Network.

58.     During the 32 years that Dr. Deligdish has lived in Melbourne Florida, he has received numerous humanitarian awards. He has served on numerous boards of philanthropic organizations, both locally and nationally. He has been honored by his community locally and

nationally. He has served on the boards of numerous professional organizations. He currently

serves as an Associate Professor of Medicine at the University of Central Florida School of

Medicine. He recently completed a multi-year term on the American Society of Clinical

Oncology Government Affairs Committee, and he currently serves on the Executive Committee

of the Florida Society of Clinical Oncology where he is the Chair of Legislative Affairs. Further,

he serves on the Florida Medical Association's Political Action Committee Board of Directors.

59.     Dr. Deligdish has held numerous leadership positions at local hospitals. He is the

founding Editor in Chief of Value Based Cancer Care. He serves on editorial boards and has co-

authored numbers peer reviewed publications in medical journals.

60.     Dr. Deligdish is board certified in internal medicine, medical oncology, and

hematology.

**Dr. Deligdish Is an Experienced and Highly Successful Relator**

61.     Even though Relator has never been an insider in any case in which it has been a

relator, Omni and Dr. Deligdish are highly experienced and successful relators.

62.     Relator has now filed four cases resulting in settlements benefiting federal and

state Governments in an amount approaching $1.5 billion. Additionally, there are numerous

cases currently under seal, and Relator is litigating two cases in the Eastern District of New

York.

63.     Indeed, Dr. Deligdish brought a prior unrelated False Claims Act case against

Health First, which settled for $3,500,000 ("Prior FCA Claim").  The settlement agreement is

dated June 9. 2017. Although this prior litigation is irrelevant to this case, at a minimum the

applicability of this settlement agreement to this case is limited, at most, to conduct occurring

before June 9, 2017.

64.     The Prior FCA Claim covers conduct that is unrelated both as to scope of temporality and therefore does not constitute a public disclosure as provided under the FCA. Even if it did, Relator, through its owner, is the original source.

## Omni Successfully Sued Health First for Anti-Trust Violations

65.     In 2013, Relator filed an antitrust lawsuit against Health First with 12 other physicians and physician groups including physicians it had never met previously, several of which were located in central Brevard County, as well as physicians that competed with Omni Healthcare who were located in south Brevard County.  Damages in this case were estimated at $346 million and the case was settled after the first day of trial for $32 million.

66.     Although this prior litigation is irrelevant to this case, at a minimum the applicability of this settlement agreement to this case is limited, at most, to conduct occurring before December 1, 2016.

67.     Health First's anti-competitive practices extend far and wide. Recently, Health First signed an agreement to purchase all or nearly all of its branded and generic pharmaceutical products from a multi-billion-dollar global healthcare services company which specializes in the distribution of medical products. The distributor provides its healthcare customer discounts, sometimes called rebates, prebates, and upfront discounts, on their purchases in exchange for exclusive purchasing arrangements. In turn, healthcare providers submitted claims for these products to taxpayer-funded programs without disclosing the discount, all in violation of the AKS. Pursuant to its agreement with the distributor, Health First received several hundred thousand dollars as an "upfront payment," which constitutes an unlawful kickback. Because these "prebates" are calculated on sales, the arrangement encourages healthcare customers to buy and prescribe more of these products.

**Health First Induced MIMA/HFMG Physicians to Refer**
**Government Beneficiaries in Violation of the Stark and Anti-Kickback Statutes**

68.     Health First has engaged—and continues to engage—in a variety of schemes and strategies to ensure physicians refer government-insured patients to Health First facilities. These payment schemes include:

- Manipulating key elements of physicians' pay formulas—specifically, the number of work relative value units and base pay—to reward doctors with a high number of referrals to Health First;

- Arbitrarily increasing compensation when physicians with a high volume of referrals to Health First complained their pay was too low;

- Adding paid medical directorships—often for services that were not provided—to keep former MIMA doctors "whole";

- Paying physicians as much as five times the average or fair market value stipend for supervising mid-level providers;

- Using work actually performed by mid-level providers as a reason to increase physician pay for high-volume referrers;

- Basing the conversion factor used to calculate physician pay on the basis of referrals and the financial contribution a doctor's work made to the Health First facilities;

- Compensating and incentivizing surgeons for surgical referrals to Health First facilities; and

- Rewarding physicians for the volume and value of designated health services including chemotherapy drugs and other medications.

16

69.     These compensation practices lead to physician pay schedules which far exceed fair market value and which are commercially unreasonable. Internal financial records for Defendant HFMG, which now includes the former MIMA doctors, show an $85 million loss in 2015. However, the losses are hidden by millions of dollars from referrals to Health First's four hospitals, an insurance company, and numerous joint ventures, which together generate more than $1.7 billion per year in revenue.

70.     The Office of Inspector General has repeatedly raised concerns about individual physicians entering into potentially illegal medical directorships and office staff arrangements. The concerns identified by the OIG include: (1) financial arrangements that take volume of referrals into account; (2) payments that do not reflect fair market value for services performed; and (3) physicians not actually providing medical directorship services for which they are being compensated. All of these concerns are at issue here.

### Health First and MIMA

71.     In 2012, MIMA was the largest multi-specialty physician group in Brevard County. Since its founding in 1969, MIMA was able to grow to 137 physicians in 31 specialties, including cardiology, dermatology, endocrinology, ENT, family practice, gastroenterology, general surgery, hematology/oncology, infectious diseases, internal medicine, nephrology, neurology, OB/GYN, orthopedics, pathology, pediatrics, physician medicine, radiology, sleep medicine, urology, and weight loss surgery. It was acquired in February 2013 by Health First, and is now part of HFMG. "MIMA" and "HFMG" will be used interchangeably throughout this Complaint to describe the physician group at issue.

72.     The practices described in the introduction above—and described in more detail herein—are rooted in Health First's efforts to create an integrated delivery model designed to

17

blunt its competition, expand its market share in Brevard County, and prevent the multi-million dollar "negative impact" the system would experience if it lost its revenue stream from MIMA doctors.

73.     In 2012, amid the negotiations to buy MIMA, Health First CEO Joseph Felkner estimated every 10 percent loss of business from MIMA physicians resulted in a $3.5 million "negative impact" on contribution margin to Health First. Felkner estimated the acquisition would protect the health system's existing revenue stream and add between $6 million and $9 million per year. At the time of the potential acquisition, an estimated 90 percent of MIMA patients were being treated at Health First facilities—potentially, a $31.5 million impact.

74.     Jim Shaw, Chairman of the Health First Board of Directors, said the acquisition was critical to the hospital chain's future. Mr. Shaw stated the following during a prior deposition:

_____

*Q: Why was it critical in Health First becoming an integrated delivery network?*

*A; Because MIMA's physician group had a high percentage of primary care physicians, and Health First's physician's group were basically specialists. ...We -- we had very few primary care physicians. MIMA provided -- roughly half of their group were primary care.*

*Q: Why was it important to have primary care physicians for the integrated delivery network?*

*A: Because they're the ones that deal directly with the patient, with the customer.*

*Q: And then they refer those patients who need further services to specialists?*

*A: Yes.*

_____

75.     The acquisition became more critical as it became clear that MIMA would be

sold. Health First attempted to purchase MIMA in 2010 for $29.7 million, but negotiations broke

down. MIMA then tried to turn to a competitor of the health system, Health Management

Associates, LLC ("HMA"). However, when those talks ended, MIMA resumed its discussions

with Health First. The $29.7 offer was contingent upon MIMA repaying $4.7 million to Health

First, which Health First claimed had been billed for duplicate, unnecessary radiation oncology

services. That claim effectively reduced Health First's offer to $25 million. Those overcharges

were detected after Health First hired an outside auditor to review MIMA's billing. The audit

came after MIMA paid $12 million to resolve government allegations that it had charged

taxpayers for radiology services that were duplicative, unnecessary, and/or had never actually

been provided.

76.     Ultimately, Health First waived the $4.7 million discount and upped the ante by

offering an additional $8.2 million for the acquisition.

## Health First Kept MIMA Doctors "Whole"

77.     As part of the deal between Health First and the MIMA physicians, Health First

required MIMA doctors to sever their directorships with other entities considered by Health First

to be competitors. Health First assured the MIMA doctors their compensation would be kept

"whole" in exchange for the doctors giving up their outside medical directorships.

78.     More than one-third—42 of 118—of MIMA's doctors receive additional

compensation from Health First as medical directors. These payments amount to tens of

thousands of dollars every year.

79.     In an April 27, 2015 email, Jutta Williams, the system's then-compliance officer,

told CEO Johnson that some of the MIMA physician contracts had some "quite serious"

potential Stark issues. There was also evidence that some of the physicians being paid as "medical directors" were not completing time sheets, and/or were performing little or no actual services.

80.     One MIMA doctor refused to sign a contract for a $40,000 medical directorship because, in his opinion, it required him to perform little or no actual service.

**Physicians Compensated for Work Not Performed**

81.     Another doctor, Tim Carter, questioned whether Health First should base his pay—and the pay of his colleagues—on work they never performed. Dr. Carter asked that accurate and appropriate measures be used to correctly calculate compensation and inappropriate codes be eliminated.

82.     However, how and how much Health First paid MIMA doctors was a "significant" part of the negotiations between Health First and MIMA.

83.     At the time of the sale, MIMA based doctor compensation on reimbursement from hands-on care by doctors and other clinicians, along with ancillary services and medical directorships. The payment system was based on how much cash was collected. Health First wanted to base pay on a standardized measure of physician work—the Relative Value Unit ("RVU") and its component, the work Relative Value Unit ("wRVU").

84.     RVUs are a standardized system designed to reduce the risk of violating Stark and the AKS. RVUs measure the amount of physician work, along with the resources and expertise needed to care for patients. A component—the wRVU—takes into account the time and skill level needed to deliver the service. The professional fee is then calculated by multiplying the wRVU by a conversion factor.

85.    Health First determined the wRVUs for the MIMA physicians and calculated the conversion factor for each doctor. In an intentional effort to convince MIMA doctors to sign on and send referrals to its system, it inflated the key elements of the calculations.

86.    First, executives at the health system determined the number of work units for each doctor, and then estimated the conversion factor used to calculate Medicare payment. The higher the conversion factor, the higher the pay. The calculation relied upon each doctor's 2011 W-2 earnings, which included pay that should not have been included.

87.    Each Shareholder Physician's Initial Floor Compensation was calculated generally based on the Shareholder Physician's gross compensation from 2011, plus 10 percent, with certain adjustments to ensure the Shareholder Physician's earnings were properly reflected. The adjustments included contributions to the MIMA 401K plan and employee payroll deductions. It deducted income from two joint ventures, as Health First purchased MIMA's interest in both entities.

88.    Health First also manipulated the second key element of the floor compensation package offered to physicians, the wRVU component awarded for each procedure. This scheme positively impacted compensation for all physicians performing multiple procedures. Furthermore, it incentivized physicians to perform hospital-based procedures. When physicians report more than one procedure during a single patient encounter, Medicare and other insurers fully reimburse the highest-valued procedure and then discount the others. The second procedure is paid 50% of the standard rate for that procedure and the third and subsequent procedures are paid 50% less than the second. These payments are reflected in the wRVUs. However, the floor compensation set by Health First—pay based on wRVUs—failed to apply the multiple-procedure discounts, artificially inflating the wRVUs and physician earnings. Urologists, for

example, received full wRVU credit for each component of the most common urology procedures, some of which should have been discounted up to 75 percent. The practice placed three of the five former MIMA urologists in the top tier nationally. Three years after putting the wRVU practice in place, Health First altered its compensation program by implementing discounts associated with multiple procedures; as a result, wRVUs plummeted, as did physician pay.

89.     Fees from medical directorships, performance pay, and a 15 percent fee for doctors supervising mid-level providers were excluded from the "floor compensation" calculation. MIMA doctors had the option of accepting a "supervising fee"—15 percent of collections—for mid-level providers or paying mid-level providers themselves and pocketing the profit. When doctors paid for the position, the work performed by the mid-levels were counted as work performed by the physicians—increasing his or her compensation even though the work was not actually performed by the doctor.

90.     The wRVU Production Floor for most physicians is determined based on services personally rendered by those physicians in 2011. However, for certain physicians who funded the cost of mid-level providers, the wRVUs produced by those mid-level providers under the supervision of those physicians were added to the physicians' wRVU production.

## On-Call Compensation

91.     Additionally, hospitals typically make arrangements with private doctors and the physicians they employ to provide on-call services such as emergency room coverage, consultation by telephone, or in-person follow-up care. The OIG has warned that these on-call services potentially create considerable risk that physicians may demand compensation as a condition of doing business at a hospital. These arrangements, the OIG said, could also be

misused to entice physicians to join or remain on the hospital's staff or to generate additional business for the facility.

92.     For these arrangements to comply with the AKS and Stark laws, the on-call arrangements must be, among other things, uniformly administered. Since at least 2013, Health First has treated employed and private physicians differently. Employed physicians providing on-call services receive wRVUs—a key component in calculating compensation—each time they care for an indigent patient. Private physicians are not compensated. These arrangements are in direct violation of the OIG rules. Additionally, Health First pays independent physicians in numerous specialties to take emergency room calls, but does not compensate its employed physicians, a practice which violates the AKS and Stark laws.

### Payment for Mid-Level Providers

93.     Health First relies on mid-level providers, also called physician extenders, to increase referrals and profit. Mid-level providers/physician extenders include, but are not limited to, healthcare providers such as nurse practitioners, nurse midwives, nurse anesthetists, and physician's assistants.

94.     MIMA pioneered these practices when it employed 31 physician extenders, including 13 in clinical practices. Health First continued the practice.

95.     A February 2013 PowerPoint presentation by Debra Johansen, the Chief Operating Administrator of the medical group, and Richard Baney, the group's Medical Director, describes the advantages, including:

- Extender averages 500 specialist referrals a year;

- Ordered more than 21,000 ancillary services, such as injections, labs, and imaging; and

- These services generated more than $500,000 in fee-for-service payments.

96.     The presentation says the practice provides support to physicians by generating "referrals to diagnostic modalities and medical specialists as indicated." It also increases physician pay.

97.     A physician at Health First said in an interview that he received between $75,000 and $100,000 from each mid-level provider each year—50 percent of the apparent profit from managing two nurse practitioners.

98.     The physician said Health First acknowledged in 2016 that its payment formulas violated CMS rules and capped the amount of physician supervision fees at $75,000. In January 2019, it capped payments at $25,000. At the time, some doctors were managing as many as six mid-level providers, producing as much as $500,000 in revenue. The physician said the sharp pay cut caused some other physicians to leave.

**Changing Physician Compensation Calculations**

99.     Health First developed an Initial Physician Compensation Plan (IPCP) when it acquired MIMA. The IPCP describes in detail the offer of employment. In its introduction, it explains: "This Compensation Plan is designed, generally, to provide former MIMA physicians with compensation levels based on their 2011 compensation (with certain adjustments), plus 10%..."

100.    Health First determined the floor compensation and productivity levels of each physician. The IPCP states that a shareholder physician's initial Floor Compensation is based, generally, on prior compensation as reflected on their W-2 plus 10%. The determination takes into account contributions to 401(k) plans, compensation earned in one year but paid in another year, and cost items.

101.    The IPCP then provides for the use of a conversion factor based on Relative Value Units ("RVUs") to determine the compensation. As provided in the IPCP: "Generally, a physician's 'Standard Rate per wRVU' is the amount of the physician's Floor Compensation divided by the physician's wRVU Production Floor."

102.    If followed, the IPCP should yield a fair market value compensation in accordance with CMS rules, the AKS and Stark.

103.    However, Health First did not actually follow the IPCP.

104.    Instead, Health First simply manipulated (and continues to manipulate) its calculations to increase physician paychecks. For example, in 2012 a physician reviewed the health system's initial calculations, crossed them out, and demanded an adjustment. Health First immediately complied. The adjustment boosted his base compensation.

105.    MIMA did not use an RVU system, so Health First determined the number of wRVUs expected each year, in this instance, at 12,041. It then calculated the conversion rate by dividing the floor compensation by the estimated wRVUs. When the physician complained the financial package was too low, Health First recalculated:

- First, without explanation, it added money to the floor compensation;

- Next, it recalculated the cash conversion factor, which—because of the increase in floor compensation—grew by almost 20 percent; and

- Finally, it added medical directorships.

This conversion factor is a key to determining compensation because it is calculated by manipulating the number of wRVUs by the conversion factor. In this case, it increased the doctor's compensation by approximately $80,000.

106.    These individualized contract negotiations between Health First and the doctors pushed 30 percent of the 73 MIMA doctors into the highest compensation levels in the country—the 80th percentile or better. It also incentivized doctors to increase their pay by increasing the number of wRVUs—the greater the number of wRVUs, the higher the pay.

107.    The above is simply one example of a widespread pattern and practice of unlawful AKS and Stark compensation schemes that have been, and continue to be, implemented by Health First.

<b><u>MIMA Physician Referrals to Health First</u></b>

108.    In May 2013, Paul Miller, the Director of Physician Office Operations for HFMG, sent an email to staff making the company's objective clear. He wrote: "[i]t is the goal to drive business within the system . . . [c]ontinuing to allow competing service reps all vying for our referrals is counterproductive to our goals . . . [e]ffectively [sic] immediately we will no longer provide marketing opportunities for competing services."

109.    Data published by CMS tracks referrals from one healthcare provider to another. Anonymized health encounters show each time a MIMA physician treated a patient who—within 60 days—was treated at one of Health First's four hospitals. Referrals from MIMA doctors to Health First hospitals dropped by 7 percent as MIMA entertained sales offers from a Health First competitor, HMA. The referrals rebounded as the medical practice began negotiating its sale to Health First in 2012, and spiked once the deal was finalized in 2013, jumping by nearly 50 percent. The referrals jumped again the following year.

110.    The 2013 and 2014 spikes in referrals to Health First facilities were most evident in four groups of MIMA doctors: cardiologists, rheumatologists, urologists, and OB/GYNs.

| Year | Referrals | % Change |
|------|-----------|----------|
| 2010 | 186,220 | |
| 2011 | 173,258 | -7% |
| 2012 | 184,309 | 6% |
| 2013 | 269,050 | 46% |
| 2014 | 300,690 | 12% |

111.    This rapid increase in referrals to Holmes Regional, Palm Bay, and Viera

hospitals is illustrated by the referral patterns of 10 of the 12 highest paid physicians:



112.    Because the data tracks referrals from patients to hospitals, the two dermatologists were not added to the chart, as most of their procedures take place in an office setting.

113.    As a group, doctors who were paid the lowest by Health First also referred the fewest number of patients.



114.    The same trend is apparent by specialty, as evidenced from a comparison of OB/GYN doctors who referred patients to Health First hospitals from 2011 through 2014:



115.    Dr. Tobia, the lowest-compensated OB/GYN physician, also referred the fewest number of patients— about 9 percent of the number of referrals which came from Dr. Benezra.

| OB/GYN | 2011 shared services | 2012 shared services | 2013 shared services | 2014 shared services | Total: 2011-2014 |
|---|---|---|---|---|---|
| BENEZRA, VICTOR | 326 | 364 | 1,142 | 1,339 | 3,171 |
| OLIVEIRA, CARLOS | 386 | 471 | 1,076 | 1,142 | 3,075 |
| BOUCHER, DANIELLE | 190 | 210 | 308 | 468 | 1,176 |
| TOBIA, STEPHEN | 47 | 60 | 83 | 143 | 333 |

These are the physicians' salaries:

| Provider | HF Specialty | Final Comp | 2013 MGMA Comp percentile |
|---|---|---|---|
| BENEZRA, VICTOR | Obstetrics/Gynecology: General | $ 1,071,341 | > 90th % tile |
| OLIVEIRA, MARIO | OB/GYN: Gynecology (Only) | $ 823,879 | > 90th % tile |
| BOUCHER, DANIELLE | OB/GYN: Gynecology (Only) | $ 470,831 | > 90th % tile |
| TOBIA, STEPHEN | Obstetrics/Gynecology: General | $ 316,552 | 55% tile |
| KELLY, DIANE * | Obstetrics/Gynecology: General | $ 271,829 | 36% tile |

116.    These same trends are evident in the compensation and referral patterns of cardiologists at Health First. The highest-paid cardiologists in each of the two specialties—invasive intervention and non-invasive—also referred more patients to Health First's four hospitals. The lowest-paid cardiologist, Dr. Norberto Schechtmann, had the fewest referrals, while the two highest paid doctors, Dr. Leonard Grecul and Dr. Mark Mendolla, had the highest number of referrals.

| While not among the highest paid heart specialists, Dr. Enrique Polanco registered among the top third of all former MIMA doctors in the number of wRVUs nationally when compared to others in his specialty. His work exceeded the expectations for | 2011 shared services | 2012 shared services | 2013 shared services | 2014 shared services | Total: 2011-2014 |
|---|---|---|---|---|---|

| procedures set by Health First when determining compensation—by 108 percent. This chart lists each cardiologist, their compensation, and comparison to their peers nationally: **Cardiologist** | | | | |
|---|---|---|---|---|
| GRECUL, LEONARD | 5,336 | 5,030 | 6,995 | 9,090 | 26,451 |
| MENDOLLA, MARK | 4,759 | 4,492 | 5,930 | 7,729 | 22,910 |
| POLANCO, ENRIQUE | 4,029 | 3,889 | 5,187 | 7,051 | 20,156 |
| SWAIN, THOMAS | 3,682 | 3,073 | 5,868 | 6,001 | 18,624 |
| KARAS, STEVEN | 2,709 | 2,773 | 3,350 | 4,437 | 13,269 |
| SCHECHTMANN, NORBERTO | 2,653 | 1,954 | 2,551 | 3,208 | 10,366 |



This chart shows their salaries:

| Provider * | HF Specialty | Final Comp | 2013 MGMA Comp percentile |
|---|---|---|---|
| Grecul, Leonard | Cardiology: Noninvasive | $ 1,129,990.68 | > 90th % tile |
| Mendolla, Mark | Cardiology: Noninvasive | $ 1,092,638.50 | > 90th % tile |
| Swain, Thomas | Cardiology: Noninvasive | $   842,585.84 | > 90th % tile |
| Polanco, Enrique | Cardiology: Noninvasive | $   610,131.45 | 83% tile |
| Karas, Steven | Cardiology: Inv-Intvl | $   828,926.52 | 89% tile |
| Schechtmann, Norberto | Cardiology: Inv-Intvl | $   681,391.09 | 72% tile |

(**These charts do not include Dr. Richard Nadolny, a 79-year-old cardiologist who earns $196,000 per year. Dr. Nadolny has a high number of referrals, but he appears to be partially retired.)

## Specialty Referrals

117.     Health First relies upon countless reports measuring everything from outside referral of cases, to ancillary services, to productivity and profitability of individual healthcare staffers in order to guard its profit margins and tighten its stranglehold on the area's medical market. Practitioners who exceed the health system's benchmarks prosper. Those who do not suffer.

118.     Every specialty area, such as cardiology, dermatology, hematology/oncology, and urology is scrutinized for the number of cases referred to outside, non-Health First entities. The

"Outside Referrals" report lists the name of the practitioner, the specialty, and the number of outside referrals. These reports track individual physicians and evaluate the effectiveness of the system-wide strategy put in place to prevent "leakage"—the handling of medical matters by non-Health First providers.

119.    The four-hospital system encourages its in-house physicians to direct patients to affiliates and affiliated doctors by requiring them to complete a time-consuming jumble of paperwork in order to send cases to outsiders, according to Health First physicians. In contrast, in-house referrals are streamlined, quick electronic transfers of patient care.

120.    Doctors who leave Health First immediately note the impact. These doctors, now outsiders, estimate fewer than 10 percent of their patients are referred from colleagues at Health First. While working as in-house doctors employed by Health First, more than 90 percent of their patients were Health First referrals.

121.    The time-consuming paperwork, the tracking reports, and the "understanding" that compensation is linked to referrals prompts doctors to refer their patients to Health First clinics, testing facilities, physicians, hospitals, and health care centers.

122.    Health First does not limit its efforts to prevent outside referrals, what it calls "leakage," to reports, tracking its doctors' action, benchmarks, and what some providers call encouragement to direct patient care to company facilities and doctors. The healthcare giant further restricts outside referrals and patient choice with a centralized scheduling system, listings of network providers, telephone calls to patients, and false and misleading statements to patients and providers. One physical therapy provider explained physicians instructed staff to refer patients to her center after surgery – a non-Health First facility – only to have schedulers from its affiliated insurance company divert them to practitioners the healthcare system employs.

123.    Between 30 percent and 40 percent of her practice is generated from patients initially treated at Health First or one of its employed physicians. Her practice continued only because two doctors impressed with post-acute care treatment outcomes interceded on her behalf. The Health First campaign to direct referrals to in-house facilities and employees has been in place for years. The in-house referral campaign intensified in late 2019 and early 2020 when five patients were asked to cancel appointments and reschedule with a Health First employed provider. Now, patients are falsely told neither she nor her practice are in the health plan's insurance network.

124.    By March 2020, referrals from one group of Health First physicians dwindled from an average of two a week to just two patients over three months. Three other doctors who commonly directed patients to her only referred two patients in all of 2019.

125.    Dr. Deligdish has been the victim of similar corrupt practices. Over the last decade, many of his patients who had been admitted to Holmes Regional Medical Center were told by Health First associates and hospitalists at the medical center that he did not have privileges at the hospital. On July 18, 2019, the admitting nurse practitioner informed the healthcare surrogate of a long-term patient that Dr. Deligdish did not have hospital privileges and had not been allowed in the facility for more than 23 years since having been "walked out the door." Dr. Deligdish has medical privileges at Holmes Regional Medical Center.

126.    The Advanced Registered Nurse Practitioner told the patient it would not be possible to see Dr. Deligdish, an oncologist, in the hospital, despite a request that he be consulted. Subsequently, another oncologist was called in.

127.    In mid-August 2019, Dr. Deligdish spoke with Brett Esrock, the CEO of the

hospital division and former CEO of Holmes Regional. In late August, he wrote Steve Johnson,

the Health First CEO, about this latest incident:

> "This has happened on numerous occasions over the last ten years, simply too
> numerous to count. This is obviously disturbing to me, and to my patients, many
> of whom are undergoing treatment for cancer when they are admitted to the
> hospital," said the August 28, 2019 letter to Johnson.  "This conduct interferes
> with patient care and has irreparably harmed my reputation in the community."

128.    The experience is no different than those encountered by other Omni Healthcare

physicians when their patients have presented to emergency rooms of Health First hospitals.

129.    Johnson responded that the concerns were addressed promptly after being brought

to Brett Esrock's attention. Health First met with the nurse to ensure she knows Dr. Deligdish

enjoys staff privileges at Holmes Regional and that patients who ask to see him should be given

the correct information.

> "We concluded there was no malicious intent and with all due respect, do not
> believe anyone affiliated with our organization has attempted to harm Omni, you
> or our patients who have a physician-patient relationship with you," Johnson
> wrote. "The nurse took full responsibility for giving the patient incorrect
> information and expressed regret."

There should, he added, be no repeat of "this situation" as Omni's principal is a valued member

of the medical staff. Since that time there have been numerous similar incidents.

130.    Yet, at about the same time, a document defaming the CEO of Parrish Medical

Center and three of its board members was sent by anonymous e-mail to Brevard County

officials. It was fashioned to appear as if it were on the letterhead of a company operated by Dr.

Deligdish and signed by the doctor.

131.    The document's metadata shows the CEO of Health First's advertising agency as

the author and a Health First vice president as a contributor. Law enforcement is investigating

the matter as well as a second fake document attacking Dr. Deligdish.

132.    Medicare requires every healthcare provider who participates to provide patient choice, which essentially prohibits hospitals and physicians from "steering patients" to specific post-acute care providers.

133.    A CMS rule finalized last year emphasized patient choice as a way to eliminate the risk of hospital bias during discharge planning. The hospital must list providers who request to be listed if those providers are certified to participate in Medicare.

> "The hospital, as part of the discharge planning process, must inform the patient or the patient's representative of their freedom to choose among participating Medicare providers and suppliers of post-discharge services and must, when possible, respect the patient's or the patient's representative's goals of care and treatment preferences as well as other preferences they express. The hospital must not specify or otherwise limit the qualified providers or suppliers that are available to the patient."

134.    The hospital must: inform patients they have freedom to choose; present a neutral list of post-acute care providers with any necessary financial and ownership disclosures; support patients in making their choice without steering or resistance; and help patients make a choice when the patient or family cannot choose or seeks assistance.

135.    The Medicare conditions for participation further require hospitals to protect and promote each patient's rights. Those rights include promptly notifying a patient's physician of his or her admission to the hospital.

136.    Health First's practices limit patient choice, violate patient rights, and violate the conditions of participation required of each practitioner serving Medicare patients. Its efforts to limit outside referrals – including designated health services, such as physical therapy – direct medical treatment to practitioners who are rewarded financially for referrals in violation of state and federal law.

137.    Health First's physician contracts provide additional encouragement to direct referrals to in-house personnel and facilities. A 2017 contract with a doctor specializing in family medicine says: "**Referrals.**  Unless a patient makes a specific request, patient's payor dictates, or if medical necessity requires otherwise, Physician shall refer all patients within the Health First system.  Physician and [Health First Medical Group] agree that only medically necessary referrals shall be made."

138.    A later provision explains the contract can be terminated early if its terms and conditions are breached.

139.    Earlier agreements incorporated a similar provision. A 2012 contract with a cardiologist read: "In order to promote the delivery of efficient, cost-effective and quality care for patients of HFMG [Health First Medical Group], Physician will use Physician's best efforts to utilize services available from HFMG or its affiliates."

140.    It lists five exceptions: a different provider is required by an insurer; the doctor determines the use of HFMG and its affiliates is not in the best medical interests of the patient; the patient, acting on his/her own, requests a different provider; HFMG does not provide the service; or, the services are necessary due to a medical emergency. Physician, the contract adds, "shall report to HFMG the reasons for utilizing a service other that HFMG's services." The reporting is for the medical group's use in evaluating whether new or modified services, different marketing programs or new or modified payer contracts should be pursued, the agreement says.

141.    Both the 2012 and 2017 agreements state the contract is intended to comply with federal and state anti-kickback and self-referral laws and compensation has not been determined in any manner that takes into account the volume or value of anticipated or actual referrals. In the 2017 contract, bonuses are tied to the volume of services provided. Effective January 1, 2018, a

physician can collect 3 percent of their annual compensation as a bonus if these criteria are met. The physician is eligible "to achieve each metric individually."

142.    "Breast Cancer Screening: The percentage of women 50-74 years of age who had a mammogram within the prior 27 months and is documented in the patient's medical record in the calendar year. Goal of 88%."

143.    "Colonoscopy: Percentage of adults 50-75 years of age who had appropriate colon cancer screening support with documentation in the patient's medical record in the calendar year. Appropriate screening includes: fecal occult blood tests within 12 months; DNA screen within 24 months; and, colonoscopy within 9 years. Goal of 77%."

144.    "Body Mass Index (BMI): Percentage of patients 18 years of age or older who had a BMI documented during the current visit or within the previous six (6) months. If the BMI was greater than or equal to 25 or less than or equal to 18.5, a follow-up plan is documented during the encounter or during the previous six (6) months. Goal of 90%."

145.    Federal regulations prohibit determining a physician's compensation based on the value or volume of referrals, including designated health services such as mammograms. Compensation based on referrals of designated health services violate the Stark law.

### Compensating Oncologists and Other Physicians Who Administer Drugs Based on the Value and Volume of Drugs Prescribed

146.    In September 2015, Defendant HFMG acquired the Space Coast Cancer Center, an oncology group employing medical oncologists and radiation oncologists. As a result of this acquisition, Health First altered its employment structure to provide bonuses based on the medications administered by doctors in violation of both AKS and Stark.

147.    The changes fashioned during the 2015 oncology group acquisition exacerbated a differential compensation system instituted when the healthcare conglomerate acquired MIMA two years earlier, arrangements that also violated laws designed to prevent kickbacks.

148.    One arrangement put in place during the MIMA acquisition rewarded doctors based on the volume and profitability of parenteral medications – drugs bypassing the skin and mucous membranes to be injected directly into the body. The larger the volume of these profitable parenteral medications, the bigger the bonus.

149.    For example, the compensation of Dr. Boris Havkin, a former MIMA doctor who was the largest utilizer of testosterone pellets in the United States – a highly profitable treatment – grew with each pellet inserted by artificially increasing the conversion factor used to calculate compensation. Havkin's pay package soared into the 90th percentile for urologists nationally.

150.    Another pay enhancement strategy increased compensation to the former MIMA dermatologists carved out through "flow through" items, such as skin care products, and directing the profit to the specialists.

151.    A third pay arrangement allocated different conversion factors to the former MIMA oncologists based on profitability as measured by reports Health First calls "Contribution Margin." These reports compare revenue and costs to calculate the contribution margin of each physician.

152.    After acquiring the Space Coast oncology group in 2015, Health First recalculated the conversion factors—the factors used in conjunction with the RVUs to calculate pay—to increase compensation to oncologists, increases linked to each physician's contribution margin. For example, a case with $21,072 and costs of $14,063 would generate a contribution margin of $7,008 for that doctor.

153.    From 2013 to 2016, the average conversion factor for five radiation oncologists and hematology/oncologists increased by 11 percent. Only one physician, Nanialei Golden, saw a decrease of 0.6 percent. Golden had the lowest contribution margin. The physicians with the highest contribution margins in their respective specialties—radiation oncology and hematology oncology—registered the highest conversion factors.

154.    Even more egregiously, Health First inflated the compensation of the newly-hired Space Coast oncologists based on the value and amount of chemotherapy drugs they administered to patients. Examples of physicians who were compensated based on this practice include, but are not limited to:

- Dr. Amit Barochia (Hematology/Oncology);

- Dr. Germaine Blaine (Hematology/Oncology);

- Dr. John Bomalaski (Gynecology Oncology);

- Dr. Ashish Dalal (Hematology/Oncology);

- Dr. Josephine Dela Cruz (Hematology/Oncology);

- Dr. David Hei (Hematology/Oncology);

- Dr. Grainger Steele Lanneau (Gynecologic Oncology);

- Dr. Joseph McClure (Hematology/Oncology);

- Dr. Firas Muwalla (Hematology/Oncology);

- Dr. James Neel (Hematology/Oncology);

- Dr. Ritesh Patil (Hematology/Oncology);

- Dr. Lee Scheinbart;

- Dr. Richard Sprawls (Hematology/Oncology);

- Dr. Simon Vinarsky (Hematology/Oncology); and,

- Dr. Solomon Zimm (Hematology/Oncology).

**Allegations Regarding Named Individuals**

155.    The individually-named Defendants named in this Complaint engineered the acquisitions discussed above. They implemented the schemes and policies to integrate healthcare services, control the market and increase revenue to produce greater profits. Their strategy rewarded doctors who directed patients to facilities owned by, and providers employed by, Health First, in violation of federal laws prohibiting pay-to-play practices that base compensation on referrals and pay doctors excessive rates that are not commercially reasonable, and that are far above market value.

156.    In order to secure compliance with its policies, the healthcare giant tracked referrals, demanded explanations when patients were directed elsewhere, and measured the financial contribution each physician made to the Defendant entities. Contracts were fashioned to enforce those policies and to link bonuses to the volume of designated health services. Those who did not comply suffered financially.

157.    Defendant Johnson pledged to weave the individual components of the system's affiliates into an integrated delivery network when he joined the company in 2011. The strategy entailed reorganizing in way in which the system acted as a network and provided incentives to encourage adherence to the plan. Approximately 18 months later, at Defendant Johnson's direction, Health First agreed to acquire the assets of the largest medical practice in the area, MIMA.

158.    Defendant Rector, the Director of Strategy, helped develop the plan. Defendant Felkner, the then-CFO, weighed the financial impact and led the negotiations to complete the deal and subsequently hired the physicians. Both reported directly to Defendant Johnson.

Defendant Stalknaker led HFMG, which employed the doctors and set policies and procedures—a critical element in implementing the strategy to integrate services in the Health First corporate family—to improve efficiency and improve revenue. At the time, Defendant Felkner estimated that every 10 percent loss of business from this group of physicians resulted in a $3.5 million "negative impact." Under the direction of these senior executives, Health First avoided that "negative impact" by implanting compensation packages that rewarded physicians who directed patients to the health system's providers—and punished those who did not.

159.    All four executives named in this Complaint were handsomely rewarded. After the MIMA deal was closed, Defendant Johnson's total compensation increased from $1.3 million to $1.6 million, a 24% increase. The following year, it rose by an additional 5%, to $1.7 million. Overall, his pay jumped by 24% according to corporate tax returns filed between 2012 and 2017. During the same time period, Defendant Felkner's total pay grew by 18%, Defendant Rector's compensation grew by 77% and Defendant Stalnaker's income increased by 160%.

160.    Beginning in 2015, three of the four individually-named Defendants also received millions of dollars in loans to pay for life insurance. By the end of fiscal year 2017, the loans to Defendants Johnson, Felkner, and Stalnaker had a balance of $14.8 million. On information and belief, Johnson, Rector, and Stalnaker received millions more in bonuses after a stake in Health First was sold to another hospital chain.

## Specific Patient Examples

161.    Relator alleges that the conduct herein establishes a pattern and practice of fraud that started in 2013 and continues to today (to the extent the temporal scope of Relator's claims is limited by prior settlement agreements, events occurring prior to June 10, 2017, are provided for context).

162.     Relator is not required to provide specific patient examples because, as an expert in the field with personal knowledge of Defendants' unlawful conduct as described herein, there is sufficient indicia of reliability without patient data.

163.     Nevertheless, Relator provides an attachment to this Second Amended Complaint, with over 5,500 detailed patient examples, including all of the relevant claims data from referral to payment by Medicare.  (See Exhibit 1.)  Since there is strict liability under the AKS as applied to the FCA, all referrals to Defendants are *de jure* unlawful, regardless of whether the procedures performed were properly performed and/or medically necessary.

164.     A summary of the provided *sample* of claims data is as follows:

| Physician | Payment | Number of Claims |
|---|---|---|
| DR. AMIT BAROCHIA MD | $27,239 | 215 |
| DR. ASHISH DALAL MD | $398,879 | 663 |
| DR. GERMAINE BLAINE MD | $0 | 9 |
| DR. JOHN BOMALASKI | $0 | 11 |
| DR. RICHARD SPRAWLS MD | $86,928 | 669 |
| ENRIQUE POLANCO MD | $19,729 | 403 |
| GRAINGER LANNEAU JR. MD | $0 | 1 |
| JAMES NEEL MD | $0 | 3 |
| LEE SCHEINBART MD | $57 | 1 |
| LEONARD GRECUL MD | $47,880 | 686 |
| MARK MENDOLLA MD | $77,169 | 1,106 |
| SIMON VINARSKY | $141,906 | 895 |
| STEVEN KARAS MD | $25,350 | 262 |
| THOMAS SWAIN MD | $45,768 | 674 |
| **Grand Total** | **$870,906** | **5,598** |

165.     For clarity's seek, Relator is not asserting that the above is the scope of claims it is filing. Rather, these patient examples are just that – examples of a widespread pattern of fraud tied to each individually named Defendant and the corporate Defendants.  Relator intends to seek

damages on behalf of the Government for the full scope of claims and temporal range available by law.

## DAMAGES

166.    Violations of Stark and AKS, which both form the basis of FCA liability, require any payment received by a prohibited referral to be refunded, and prohibits payment for any designated health services furnished in violation of the law.

167.    At the time of MIMA's acquisition by Health First, Dr. Martin Isenman, a negotiator and former MIMA chairman, said the practice was generating approximately $100 million per year. The 2013 deal, which was not commercially reasonable and exceeded fair market value, guaranteed all MIMA business would flow to Health First.  This deal is still in place today.

168.    Between 2013 to present, MIMA contributed approximately $633 million to Health First. During this time period, Medicare and Medicaid represented between 60 and 61 percent of patient revenue, according to a summary of Payor source prepared by Health First. Therefore, revenue from taxpayer-funded healthcare programs and the damages from June 10, 2017, through the present amounts to $180 million.

## COUNT I
### Violations of the Federal False Claims Act for Unlawful Kickbacks
### and Violations of the Stark Act

169.    Relator incorporates paragraphs 1 through 168 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

170.    As described in greater detail above, Defendants defrauded Government healthcare programs by conspiring to submit and/or causing the submission of false and/or

fraudulent claims Defendants knew were tainted by violations of the Anti-Kickback and Stark statutes.

171.    Under the FCA, Defendants have violated:

i.    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii.    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii.    31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subsections (A) and/or (B).

172.    Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II
### Violations of the Florida False Claims Act for Unlawful Kickbacks and Violations of the Stark Act

173.    Relator incorporates paragraphs 1 through 168 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq*.

174.    As described in greater detail above, Defendants defrauded Government healthcare programs, including the Florida Medicaid program, by conspiring to submit and/or causing the submission of false and/or fraudulent claims Defendants knew were tainted by violations of the Anti-Kickback and Stark statutes.

175.    Under the Florida FCA, Defendants have violated:

i.   Fla. Stat. § 68.082(2)(a) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

ii.  Fla Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; and

iii. Fla. Stat. § 68.082(2)(c) by conspiring to commit a violation of subsections (a) and/or (b).

176.   Because of the false claims made by Defendants, the State of Florida has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the Florida FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States of America and the State of Florida, respectfully requests that:

a.   This Court enter an order determining that Defendants violated the FCA and the Florida FCA by making false statements and records to cause false claims to be submitted to the United States and the State of Florida;

b.   This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and each false or fraudulent claim presented to the State of Florida;

c.   This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

    d.   This Court enter an order paying Relator the maximum statutory award for its

        contributions to the prosecution of this action; and

    e.   This Court award any and all other relief as it determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated:  November 13, 2020              Respectfully submitted,

                           */s/ Jesse L. Hoyer*
                           Jesse L. Hoyer
                           Florida Bar No.: 076934
                           jesse@hoyerlawgroup.com
                           Sean Estes
                           Florida Bar No.: 048320
                           sean@hoyerlawgroup.com
                           Hoyer Law Group, PLLC
                           2801 W. Busch Blvd., Suite 200
                           Tampa, Florida 33618
                           Tel.: 813-375-3700/Fax: 813-375-3710

                           **Counsel for Relator**

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been served by

CM/ECF on November 13, 2020, on all counsel or parties of record.

                           */s/ Jesse L. Hoyer*
                           Jesse L. Hoyer