UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA;
STATE OF FLORIDA; and OMNI
HEALTHCARE, INC.,

    Plaintiffs,

v.                                                              Case No. 6:19-cv-2237-Orl-37LRH

HEALTH FIRST, INC.; HEALTH FIRST
MEDICAL GROUP, LLC; STEVEN
JOHNSON; JOSEPH FELKNER; DREW
RECTOR; LEONARD GRECUL; MARK
MENDOLLA; THOMAS SWAIN;
STEVEN KARAS; ENRIQUIE
POLANCO; JOSEPH MCCLURE; LEE
SCHEINBART; SIMON VINARSKY;
MATTHEW GERELL; AMIT
BAROCHIA; ROBERT SPRAWLS;
ASISH DELAL; JOHN BOMALASKI;
GERMAINE BLAINE; FIRAS
MUWALA; RITESH PATIL;
GRAINGER STEELE LANNEAU;
JAMES NEEL; and JEFFREY
STALNAKER,

    Defendants.
_____

**ORDER**

Before the Court are four motions to dismiss Plaintiffs' Second Amended *Qui Tam* Complaint (Doc. 50 ("**Complaint**")). (Docs. 55–58 (collectively, "**Motions**").) Plaintiff/Relator Omni Healthcare, Inc. ("**Relator**" or "**Omni**") responded. (Doc. 65.) On review, the Motions are granted in part.

1

## I. BACKGROUND[1]

First, some brief context on *qui tam* actions. "The False Claims Act [**FCA**] is the primary law on which the federal government relies to recover losses caused by fraud." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 870 (11th Cir. 2019) (citation omitted). "The FCA permits a private individual, known as a relator, to bring a *qui tam* action on the relator's behalf and the government's behalf for any FCA violation." *U.S. ex rel. Mastej v. Health Mgmt. Assoc., Inc.*, 591 F. App'x 693, 696–97 (11th Cir. 2014).

Here, Relator alleges Defendants are engaged in a fraudulent scheme, whereby doctors are rewarded monetarily for referring patients to receive care within the same health system and for prescribing drugs; then Medicare is billed for those patients. (*See* Doc. 50.) Let's first discuss the actors before turning to the scheme and the Medicare claims.

### A. The Actors

Defendant Health First Medical Group LLC ("**HFMG**") is a multi-specialty physician group.[2] (Doc. 50, ¶ 8.) Defendant Health First, Inc. ("**Health First**") is a health system that owns HFMG and four hospitals. (*Id.*) Defendants Steven Johnson, Joseph Felkner, Drew Rector, Matthew Gerrell, and Jeffrey Stalnaker ("**Executive Defendants**") were executives of Health First and HFMG. (*Id.* ¶¶ 10–14.) Defendants Leonard Grecul, Mark Mendolla, Thomas Swain, Steven Karas, and Enrique Polanco ("**Cardiologist**

---

[1] The facts in the Complaint (Doc. 50) are taken as true and construed in the light most favorable to Plaintiffs. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).
[2] HFMG was formerly known as Melbourne Internal Medicine Associates, P.A. so at times the Complaint, uses "MIMA" to refer to HFMG. (*See* Doc. 50, ¶¶ 8, 17.)

**Defendants**") are cardiologists at HFMG. (*Id.* ¶¶ 15–19.) And Defendants Joseph McClure, Lee Scheinbard, Simon Vinarsky, Firas Muwalla, Grainger Steele Lanneau, Ritesh Patil, James Neel, Richard Sprawls, John Bomalaski, Amit Barochia, Germaine Blaine, and Ashish Dalal ("**Oncologist Defendants**") are oncologists at HFMG. (*Id.* ¶¶ 20–29, 154.)

Omni is a multi-specialty physician group, like HFMG, partially owned by Dr. Craig Deligdish. (*Id.* ¶¶ 7, 48.) Dr. Deligdish has a prominent private practice and in his free time, acts as a relator with Omni. (*See id.* ¶¶ 48–61.) Dr. Deligdish's personal experience with Health First has not been positive. (*See id.* ¶¶ 125–129.) Despite having medical privileges at one of Health First's hospitals, an admitting nurse practitioner told Dr. Deligdish's patient he did not. (*Id.* ¶ 125.) Dr. Deligdish complained to the hospital's CEO, Mr. Johnson, about the incident. (*Id.* ¶ 127.) Mr. Johnson responded that the nurse was informed Dr. Deligdish had hospital privileges and assured Dr. Deligdish it would not happen again. (*Id.* ¶ 129.) But since then, there have been similar incidents. (*Id.*)

**B.    The Scheme**

Relator contends this is part of a larger problem: a scheme by Health First and HFMG to reward its doctors for referring patients internally, rather than to healthcare facilities not owned by Health First. (*See id.* ¶¶ 81–107.) Relator alleges multiple ways this occurs. (*See id.*)

First, medical directorships. When Health First acquired HFMG, it required HFMG doctors to sever their directorships with entities Health First considered competitors. (*Id.* ¶ 77.) Health First assured HFMG doctors they would be made whole

through compensation. (*Id.*) More than a third of HFMG's doctors receive additional compensation from Health First as medical directors, despite some doctors failing to complete time sheets and performing little services. (*Id.* ¶¶ 78–79.) One HFMG doctor refused a medical directorship because he thought it required him to perform little to no service. (*Id.* ¶ 80.)

Second, pay formulas. Health First compensates HFMG doctors based on the Relative Value Unit ("**RVU**") formula, which measures the physician work and the resources and expertise needed to care for patients. (*Id.* ¶¶ 83, 84.) And the "wRVU," a component of the RVU, considers the time and skill needed to deliver a service. (*Id.* ¶ 84.) The RVU is multiplied by a conversion factor to create a professional fee. (*Id.*) Health First inflated the conversion factor by basing it on doctors' W-2 earnings, which included pay that should not have been included. (*Id.* ¶ 86.) The wRVU also artificially inflated compensation for physicians performing multiple procedures—not applying discounts when multiple procedures were performed at once, despite Medicare only reimbursing for one procedure at a time. (*Id.* ¶ 88.)

Third, on call compensation. Physicians that work for Health First receive wRVUs for on-call services, increasing their compensation but private physicians don't. (*Id.* ¶ 92.)

Fourth, mid-level providers. Mid-level providers include nurse practitioners, nurse midwives, nurse anesthetists, and physician's assistants. (*Id.* ¶ 93.) HFMG employed 31 mid-level providers and noted these mid-level providers refer patients to physicians and increase physician pay. (*Id.* ¶¶ 94–96.) One Health First physician said he received between $75,000 to $100,000 from each mid-level provider each year. (*Id.* ¶ 97)

4

Fifth, physician compensation calculations. When Health First acquired HFMG, it developed a plan to compensate physicians based on RVUs. (*Id.* ¶¶ 99–101.) If the plan was followed properly, it would yield a fair market value compensation for physicians. (*Id.* ¶ 102.) But Health First did not follow the plan; instead it increased physician paychecks. (*Id.* ¶¶ 103–04.) In 2012, a physician demanded an adjustment on his compensation and Health First gave in, despite it being contrary to the RVU system—the doctor's compensation increased by $80,000. (*Id.* ¶¶ 104–05.)

Parallel to these strategies are the referrals. (*See id.* ¶¶ 108–45.) Publicly available data shows each time a HFMG physician treated a patient that same patient was later treated at one of Health First's four hospitals within sixty days. (*Id.* ¶ 109.) After Health First acquired HFMG, referrals from HFMG physicians to Health First hospitals spiked. (*Id.*) And the doctors that referred the fewest number of patients were paid the least; those that referred the most were paid the most. (*Id.* ¶¶ 113–16.) Health First scrutinized doctors for the number of patients they referred to outside, non-Health First entities. (*Id.* ¶ 118.) And Health First discourages these outside referrals by requiring time-consuming paperwork to make an outside referral—paperwork unnecessary for an internal referral. (*Id.* ¶ 119.)

The preference for internal referrals is also reflected in doctors' contracts. (*See id.* ¶ 137.) One doctor's 2017 contract directed him to refer patients within the Health First system unless the patients request otherwise, the patient's payor dictates, or it's medically necessary to go elsewhere. (*Id.*) The contract states compensation has not been determined by considering the volume of referrals. (*Id.* ¶ 141.) But a doctor can collect a

5

bonus if she arranges for a certain percentage of breast cancer screenings, colonoscopies, and body mass index assessments for her patients. (*Id.* ¶¶ 141–44.)

Health First also provided bonuses to HFMG oncologists based on the volume and value of medications they prescribed. (*Id.* ¶¶ 146–54.) Their compensation was based on their "Contribution Margin" which is the difference between revenue and cost from patients. (*Id.* ¶¶ 151–52.) And fifteen oncologists were paid based on the value of the chemotherapy drugs they administered. (*Id.* ¶ 154.)

### C. Medicare Claims

But it's not an FCA action without fraudulent submissions to the Government. *See* 31 U.S.C. § 3729(a). Relator attaches a document with over 5,500 entries listing a redacted patient name, the Medicare claim number, the date, the physician, and the Medicare payment. (Doc. 50-1.) These entries include claims from several named Defendants. (*See id.*)

So Relator sued Defendants under the federal FCA and Florida's FCA, alleging Defendants defrauded Florida and the United States. (Doc. 50.) The United States and the State of Florida declined to intervene. (Docs. 7, 8.) Now Defendants move to dismiss the Complaint. (Docs. 55–58.) With Relator's response (Doc. 65), the matter is ripe.

## II. ANALYSIS

Defendants argue Relator lacks standing and the Complaint fails to satisfy Federal Rules of Civil Procedure 8 and 9(b). (Docs. 55–58.) Let's take each in turn.

### A. Standing

Article III, Section 2 of the United States Constitution limits federal courts'

6

jurisdiction to actual cases and controversies. Standing is a part of this limitation, as a threshold jurisdictional question that must be resolved before a court can turn to a claim's merits. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). Health First, HFMG, and Oncologist Defendants, argue Relator lacks standing because Relator signed a general release against Defendants for claims predating June 9, 2017. (Doc. 55, pp. 36–39; Doc. 56, p. 16.) And so, they argue, Relator has no standing to sue for these claims. (Doc. 55, pp. 36–39; Doc. 56, p. 16.) But Relator explicitly alleges the relevant conduct occurred from June 10, 2017 through present day. (Doc. 50, ¶ 2.) So the standing argument is without merit.

### B. False Claims Act

The Court analyzes Relator's federal and Florida FCA claims together, as the parties do, because the Florida FCA is modeled after the federal FCA. (Docs. 55–58, 65); *see U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007). To establish a cause of action under the FCA, "a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States v. R&F Prop. Lake Cnty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005) (citing 31 U.S.C. § 3729(a)).

Since FCA claims are based upon *fraudulent* submissions to the Government, they must be pled with particularity under Rule 9(b). Fed. R. Civ. P. 9(b); *see Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). "An FCA complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically

the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Mastej*, 591 F. App'x at 703 (cleaned up). Let's first review the alleged fraudulent scheme before turning to the Medicare claims.

### 1. Fraudulent Scheme

A healthcare provider is liable under the FCA "if it falsely certifies that it is in compliance with federal health care laws that are a condition of payment." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 788 (11th Cir. 2018). Relator alleges Defendants violated two such health care laws—the Stark Statute and the Anti-kickback Statute. (Doc. 50); *see U.S. ex rel. Mastej*, 591 F. App'x at 697–98. "[T]he Stark statute prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with the hospital." *U.S. ex rel. Mastej*, 591 F. App'x at 698. And it prohibits "that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients. *Id.* "[T]he Anti-kickback statute prohibits a hospital from financially inducing a person to refer a Medicare patient." *Id.* It also prevents receiving a kickback for recommending purchase of any item for which payment may be made by a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

Relator alleges Health First compensates HFMG doctors based on referrals to Health First facilities. (Doc. 50, ¶ 1.) It says Health First accomplishes this by inflating HFMG doctors' compensation through medical directorships, manipulated pay formulas, on-call compensation, and pay for supervising mid-level providers. (*Id.* ¶¶ 77–107.) But Relator does not specify which doctors were overpaid for their referrals nor do the allegations directly connect the compensation strategies with the number of referrals,

8

leaving the Court with the conclusion that *all* HFMG doctors were overpaid, regardless of referrals. (*See id.*); *cf. U.S. ex rel. Mastej*, 591 F. App'x at 705 (identifying the names of the doctors who received the improper incentives). Relator alleges HFMG doctors who refer the most are paid the most and HFMG doctors who are paid the least refer the least. (Doc. 50, ¶ 113.) But Relator does not explain *how* this occurs—or tie the statistical anomaly to a fraudulent act. And the allegations regarding doctors' contracts don't fare better. Relator alleges doctors receive bonuses based on meeting a percentage of certain screenings and tests for patients but doesn't allege these screenings must be done through referrals to Health First facilities. (*See id.* ¶¶ 141–44.) As Relator has not alleged how Health First paid HFMG based on referrals, it fails to satisfy Rule 9(b). *See Bingham*, 783 F. App'x at 877.

Relator also alleges oncologists were paid based on the drugs they prescribed, in violation of the Anti-Kickback Statue. (Doc. 50, ¶¶ 146–54.) But Relator's explanation of *how* this occurs is confusing. Relator alleges Health First used a report called the "Contribution Margin" to calculate an oncologist's compensation. (*Id.* ¶ 151.) The Contribution Margin compares "revenue and costs to calculate the contribution margin of each physician." (*Id.*) As an example, Relator says "a case with $21,072 and costs of $14,063 would generate a contribution margin of $7,008 for that doctor." (*Id.* ¶ 152.) But then the Contribution Margin seems to depend on numerous other avenues for revenue beyond drugs. (*See id.*) So it's not clear *how* the Contribution Margin compensates oncologists based on their drug administration, rather than for example, cutting costs. (*See id.*) Realtor also alleges fifteen oncologists (twelve are Oncologist Defendants), were

compensated by Health First based on the value and amount of chemotherapy drugs they administered. (*Id.* ¶ 154.) But it does not allege *when* this occurred or provide any further detail on the scheme. (*Id.*) Relator references "newly-hired Space Coast oncologists" which appears to refer to the 2015 acquisition of the Space Coast Cancer Center by HFMG. (*Id.* ¶ 146.) But Relator's claims are limited from June 10, 2017 to present. (*Id.* ¶ 2.) So Relator has failed to allege a fraudulent scheme with particularity. *See U.S. ex rel. Mastej*, 591 F. App'x at 703.

### 2. Medicare Claims

Even if Relator had properly alleged a fraudulent scheme under Rule 9(b), it has failed to allege the "*sina qua non* of an FCA violation"—a false submission to the United States. *U.S. ex rel. Mastej*, 591 F. App'x at 703 (cleaned up). A relator cannot "describe a private scheme in detail" and then allege, with no reason for its belief, that a false claim was submitted to the Government. *Id.* at 704 (cleaned up). "Instead, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Id.* (cleaned up). While "a relator with direct, first-hand knowledge of the defendants' submission of false claims" may provide that reliability, "a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation." *Id.* "At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted." *Id.*

Relator attached to its Complaint an over 300-page list of Medicare claims, with seventeen categories: patient last name; patient first name; gender; DOB; Medicare Part;

10

Claim #; From Date; Thru Date; Rendering NPI; Rendering NPI Taxonomy; Rendering NPI Address; Rendering NPI City; Rending NPI State; Medicare Payment; Principal Dx; and Primary Procedure Code.³ (Doc. 50-1 ("**Medicare List**").) For example, the first entry is for a female treated from January 12, 2017 through January 19, 2017 by Dr. Barochia in Melbourne, Florida for dehydration—Medicare paid $2.94. (*Id.* at 3.) While detailed, the Medicare List is missing critical details. Were these patients referred? Or was the Medicare claim for a drug attached to an improper kickback?

Assuming Defendants engaged in a fraudulent scheme to pay doctors based on referrals or drug administration, this conduct only becomes an FCA violation if Defendants billed Medicare for referred patients or patients prescribed drugs under the fraudulent system. *See U.S. ex rel. Mastej*, 591 F. App'x at 706. The Medicare List does not specify whether the patient was referred to Health First or simply walked in the door to receive medical care. (*See* Doc. 50-1.) It also does not specify *who* billed Medicare for the claims. (*See id.*) Health First? HFMG? The treating physician? Without these details, the Medicare List does not sufficiently allege a false claim was submitted to the United States by Defendants under Rule 9(b). *See United States v. Choudhry*, 262 F. Supp. 3d 1299, 1310 (M.D. Fla. 2017).

Relator contends it need not provide specific examples of false claims because "as an expert in the field with personal knowledge of Defendants' unlawful conduct . . . there is sufficient indicia of reliability without patient data." (Doc. 50, ¶ 162.) Not so. Relator is

---

³ Patients' personal identifying information has been redacted. (*See* Doc. 50-1.)

11

not an insider—Dr. Deligdish did not work for Health First or HFMG. (*See id.* ¶ 61.) And Relator provides no other basis to establish personal knowledge of Defendants' billing practices. (*See* Doc. 50.) According to the Complaint, Dr. Deligdish's first-hand account of Defendants' practices relates to them denying him hospital privileges. (*Id.* ¶¶ 125–29.) This does not give him personal knowledge of Defendants' claims to Medicare. (*See* Doc. 65, pp. 5–7.) Without personal knowledge of billing practices, Relator must provide sufficient details of Defendants' false claims to provide the requisite indicia of reliability to the Complaint. *See U.S. ex rel. Mastej*, 591 F. App'x at 704–05. It has not done so.

Instead, Relator improperly "piles inference upon inference." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1315, 1326 (11th Cir. 2009). While Relator "is not expected to actually *prove* his allegations," the Court "cannot be left wondering whether a plaintiff has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002). Relator failed to allege with particularity *how* Health First and HFMG compensated doctors based on referrals, *who* was part of this fraudulent scheme (as opposed to all HFMG doctors), *when* oncologists received bonuses based on drug administration, and *which* Medicare claims were tainted because of improper referrals or kickbacks for drug administration—and as an outsider, the basis for these allegations. *See U.S. ex rel. Mastej*, 591 F. App'x at 703–705. As Relator fails to meet the requirement of Rule 9(b), the Complaint is dismissed, but without prejudice. *See Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568–69 (11th Cir. 1994). Relator will be given an opportunity to

amend the Complaint. But opportunities to amend are not unlimited, so Relator is encouraged to provide as much detail as possible to satisfy Rule 9(b).

## IV. CONCLUSION

It is **ORDERED AND ADJUDGED**:

1. Defendants Health First, Inc. and Health First Medical Group, LLC's Motion to Dismiss (Doc. 55); Oncologist Defendants' Dispositive Motion to Dismiss (Doc. 56); Defendants, Leonard Grecul, Mark Mendolla, Thomas Swain, Steven Karas, and Enrique Polanco's Motion to Dismiss (Doc. 57); and Defendants Steven Johnson, Joseph Felkner, Drew Rector, Matthew Gerrell and Jeffrey Stalnaker's Motion to Dismiss (Doc. 58) are **GRANTED IN PART AND DENIED IN PART**:

    a. Plaintiffs' Second Amended Qui Tam Complaint (Doc. 50) is **DISMISSED WITHOUT PREJUDICE**;

    b. In all other respects, the Motions are **DENIED**.

2. By Thursday, **February 4, 2021**, Plaintiffs may file an amended complaint correcting the deficiencies identified in this order. Failure to timely file will result in this action being closed without further notice.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 22, 2021.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record